2021 IL App (2d) 190473-U
No. 2-19-0473
Order filed October 25, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kendall County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 12-CF-299 |
| SEAN HEMPHILL, | ) ) | Honorable John F. McAdams, |
| Defendant-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE BRIDGES delivered the judgment of the court.
Justices Zenoff and Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court did not err in its ruling on defendant's *Brady* claim or in allowing evidence under section 115-10. There was sufficient evidence to prove defendant guilty beyond a reasonable doubt. The trial court also did not err in its evidentiary rulings, and defendant did not receive ineffective assistance of counsel. Therefore, we affirm.

¶ 2    Following a second trial, defendant, Sean Hemphill, was found guilty of eight counts of

aggravated criminal sexual abuse (720 ILCS 5/11-1.6(b), 11-1.6(c)(1) (West 2012)) and four

counts of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2012)).  He

was sentenced to 45 years' imprisonment. On appeal, he argues that (1) the State violated *Brady*

*v. Maryland*, 373 U.S. 83 (1963), by wrongfully withholding evidence which would have led to an acquittal after the first trial; (2) the trial court erred in admitting hearsay statements under section 115-10 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10 (West 2012)); (3) there was insufficient evidence to prove him guilty beyond a reasonable doubt; (4) the trial court erred regarding various evidentiary issues; and (5) his trial counsel provided ineffective assistance. We affirm.

¶ 3                                     I. BACKGROUND

¶ 4                                     A. First Trial

¶ 5     On October 10, 2012, defendant was charged by indictment with four counts of aggravated criminal sexual abuse. The charges alleged that on or about January 1, 2012, defendant committed an act of sexual conduct with his daughter A.P.H., who was under 18 years of age, in that he had A.P.H. touch his penis for the purpose of his sexual gratification.

¶ 6     Prior to trial, on March 6, 2013, the State gave notice pursuant to section 115-10 of its intent to introduce out-of-court statements that A.P.H. made to: her mother, Ryan Hemphill (Ryan); Child Advocacy Center personnel on January 11, 2012; and school personnel. A hearing on the motion took place on August 8, 2013, and August 12, 2013. On August 16, 2013, the trial court ruled that the following statements were admissible: statements that A.P.H. made to her mother during A.P.H.'s bath on January 4, 2012; statements made before, during, and after the family visited a Wendy's restaurant on January 5, 2012; statements made during A.P.H.'s Victim Sensitive Interview (VSI) at the Child Advocacy Center; and statements that A.P.H. made to assistant principal Dawn Marmo at Long Beach Elementary School.[1]

---

[1] Though the trial court specified Marmo, the State had sought to introduce statements that

¶ 7      Defendant's jury trial began on March 17, 2014. We restate the facts from this trial as set forth in defendant's prior appeal. See *People v. Hemphill*, 2016 IL App (2d) 151196-U.

¶ 8      A.P.H. was the first witness and testified as follows. She was born on January 4, 2004, and was currently ten years old. In 2012, she lived with both of her parents in a three-bedroom house. She was afraid to sleep in her own bed because she once saw an ant crawling on it. Her parents slept in different bedrooms, so at night A.P.H. would sleep with one of them. One day, she heard from some other children that if a boy kissed a girl, the girl would get pregnant. That did not make sense to A.P.H. because her parents kissed all the time, and her mother would not become pregnant. On January 5, 2012, she was going to sleep in defendant's bed and asked him about what she had heard. Defendant told her what it meant to be pregnant, and he talked about girls' and boys' "body parts."

¶ 9      The assistant state's attorney asked A.P.H. at trial, "Did you ask him to do something?," and she replied, "No." He told her not to tell anyone, but she told her mom and "Mr. Lipke." When asked, "The thing that you told your mom and the other people, did that really happen?", A.P.H. replied in the affirmative. A.P.H. was asked if she wanted "to tell these people what happened to you in bed with" defendant, and she stated, "He just told me what it meant." The assistant state's attorney again asked "Now, when he told you what it meant, did you ask him to do anything else?", and A.P.H. replied, "No."

¶ 10      Next, three officers collectively testified that they were dispatched to A.P.H.'s home on the evening of January 5, 2012. A.P.H. alternated between being excited because she had just had

_____

A.P.H. had made to school personnel, not just Marmo, and the trial court granted the State's motion.

a birthday, to being upset and crying. Ryan provided a written statement, and defendant ended up leaving the house voluntarily.

¶ 11    When the trial resumed the next day, defendant orally objected to any of A.P.H.'s out-of-court statements being admitted into evidence; the trial court had previously deemed them admissible after the section 115-10 hearing. Defendant argued that A.P.H. did not testify as to any criminal conduct by him, so the hearsay statements were not admissible under *People v. Learn*, 396 Ill. App. 3d 891 (2009). The trial court denied the motion, stating that it believed that the testimony was sufficient to meet the minimum threshold for the admission of evidence under section 115-10.

¶ 12    Erin Buddy then provided the following testimony. On January 30, 2012, she was substitute teaching at Long Beach Elementary School, as she had been doing every Wednesday. On that particular day, she was working with three second-grade students, including A.P.H., on literacy skills. A.P.H. looked unusually tired, and Buddy asked if she was all right. A.P.H. said that she did not sleep well the previous night, and Buddy asked if she was out doing something fun. A.P.H. replied that she was not sleeping well because her daddy asked her to either come into his bed or asked if he could join her in her bed. Buddy reported the conversation to the school social worker and Assistant Principal Marmo. The rest of the academic year, whenever Buddy asked A.P.H. how she was doing, A.P.H. would say that she was fine.

¶ 13    Marmo testified as follows. On January 30, 2012, A.P.H. came into her office and told her that she was upset and sad because her parents were divorcing and because she really wanted a brother or sister. A.P.H. said that when she and her mother were taking a bath together, she talked to her mom about her father. A.P.H. told Marmo that the divorce was her fault because she had asked her dad about sex and about boys' and girls' "parts," and that he had shown her "his parts."

Marmo asked the principal, Mr. Lipke, to come into the room, and A.P.H. repeated the statement. Marmo contacted the Department of Children and Family Services. Later that day, A.P.H. came up to Marmo on the playground at recess. A.P.H. asked if Marmo was married, had children, and knew what it meant to be "hard." Marmo responded in the affirmative, and A.P.H. said that her daddy had showed her what being hard meant. A.P.H. then said that there was "a lot more" but that she did not want to talk about anything else. A.P.H. said that Marmo could tell Mr. Lipke about their conversation, but not her mother.

¶ 14    Ryan provided the following testimony. She and defendant married in 2003, and A.P.H. was their daughter.  In January 2012, she worked from home. The household's atmosphere was "pretty good," though she and defendant would have small arguments every week. Ryan loved defendant and believed that he loved her.

¶ 15    A.P.H.'s room had a twin-size bed, and the master bedroom and guest room each had queen-size beds. Ryan would get up around 4:30 or 5 a.m. to start work so that she could spend more time with her family later in the day. Ryan would sleep in the guest room three or four nights per week because defendant was a light sleeper, and Ryan's alarm would wake him up. Ryan snored, which also interfered with defendant's sleep. A.P.H. did not like to sleep in her bed because one night she saw an ant in her bed, and she was convinced that every time she slept in her bed, an ant would be there. A.P.H. began sleeping in whatever room Ryan was in. However, a few months before January 2012, defendant said that A.P.H. should be able to choose wherever she slept, with the thought that eventually she would choose her own bed.

¶ 16    On January 4, 2012, Ryan and A.P.H. planned to meet defendant for A.P.H.'s birthday dinner. Ryan was helping A.P.H. wash her hair, and A.P.H. said that she knew the difference between girls' and boys' parts. Ryan replied that she knew A.P.H. had seen her baby cousin

Caleb's diaper changes. A.P.H. said that she had seen and touched defendant's private parts. Ryan asked if she had seen him after a shower or getting dressed. A.P.H. said no, that she had asked if she could see them, and he let her. A.P.H. said that there was a part with soft skin and hair on it, with two balls inside. A.P.H. asked what the balls were called, and Ryan said testicles. A.P.H. replied, "[Y]eah." During this time, A.P.H. seemed normal and happy. A.P.H. said that there was another part that stuck out in the front, with a hole in it where the pee came out. She asked if that was called the penis, and Ryan responded affirmatively. Ryan had used those words with A.P.H. once or twice when talking about Caleb. At this point, Ryan was "alarmed because what [A.P.H.] had described to [her] was obviously an adult['s] genitals, not a child['s]." Ryan asked what defendant had showed her, and A.P.H. said that they played a game where they took the testicles' skin and stretched it over the penis to cover it up, A.P.H. would take it off, and "it" would be a present or surprise. Sometimes they pretended "it" was a piece of candy. A.P.H. described another game where they would pretend that the penis was a marker, and if you squeezed one ball, blue ink would come out, and if you squeezed the other ball, green ink would come out. A.P.H. noticed that Ryan had gone quiet, and A.P.H.'s face "dropped." A.P.H. said that Ryan could not tell defendant or anyone else what A.P.H. had said because otherwise, defendant could go to jail. Ryan said that she would not make such a promise because in their family, they did not keep secrets. Ryan asked where and when this had happened. A.P.H. said that they played the game in the master bedroom, before bed. A.P.H. could not provide a date, and when Ryan asked if it happened before or after Christmas, A.P.H. said that it occurred after Christmas. Ryan said that she was glad A.P.H. had told her. They went out to dinner, but Ryan did not confront defendant at that time because she did not want to ruin A.P.H.'s birthday and did not want to talk to him in front of her.

¶ 17    Ryan insisted that A.P.H. sleep with her that night. The next evening, Ryan talked to defendant while A.P.H. was at her tae kwon do class. Ryan repeated what A.P.H. had said, and defendant was very quiet. He asked what she was talking about and why A.P.H. would say those types of things. They picked up A.P.H., and when they were pulling out of the parking lot, A.P.H. must have seen that defendant was upset. She blurted out, "[S]ee, I told you if I told everything that dad could get in trouble." Ryan asked A.P.H. to repeat what A.P.H. had told her, and A.P.H did so. Defendant asked why she was saying this and who had done this. A.P.H. leaned forward and said, "[Y]ou and me." They went to eat at Wendy's. A.P.H. said that she should not have told Ryan, that defendant was upset, and that he could go to jail. She asked why Ryan could not keep a secret.

¶ 18    They returned to the house, and Ryan told defendant that they should talk to A.P.H. one more time. A.P.H. started to say the same things again, and defendant told her to tell the truth. Defendant asked why she was saying such things, and she replied, "[B]ecause you did." When defendant again asked why she was saying such things, A.P.H. got a "crushed" look on her face. Subsequent to these disclosures, Ryan filed for divorce, and the divorce was now final.

¶ 19    Michelle Hawley testified that she was the mental health assistant director of the Kendall County Health Department. As part of her job, she worked at the Children's Advocacy Center interviewing children who may be victims of physical or sexual abuse. She would meet with the parent before the interview to obtain the parent's consent and learn about the situation, and she would review police reports. On January 11, 2012, she interviewed A.P.H., and the interview was recorded. During the course of the interview, Hawley had A.P.H. identify male and female anatomy on charts; the charts were admitted into evidence.

¶ 20    A video recording of the interview was played for the jury, which was also given transcripts. We summarize the interview's contents. A.P.H. told Hawley that she told her mom that she asked defendant what sex was and if she could see what his private parts looked like. A.P.H. thought sex was when a couple kissed and laid in bed together. Defendant told her the "right thing," that sex was when a boy puts his penis in "her" private parts and then "yucky stuff comes out." This conversation occurred three days before A.P.H.'s birthday, when they were in his bed. Defendant let A.P.H. see his private parts; defendant had his sleep shorts on and took his penis out through the hole in the shorts. A.P.H. asked if she could touch it, and he said, "Yes." This happened only one time.

¶ 21    At this point in the interview, A.P.H. said that she wished that she had never told her mother because then her mom would not have called the police, and defendant would not have left. A.P.H. then said that on the same night, she and defendant played a game two times about changing the color of "pencils." A.P.H. thought up the game because the penis was shaped like a "marker." A.P.H. touched the side of the penis and held it with her hand for one second each time. Defendant then said what "it [was]," which was "a marker." Then A.P.H. dropped it, and they went to bed. The penis was soft, and nothing came out of it. Defendant told A.P.H. not to tell her mom because he could go to jail for it.

¶ 22    Previously, A.P.H. had not seen defendant's penis. She had often felt it on her leg when she was sleeping with him; it would come out when defendant was moving around. At these times, A.P.H.'s mom was working or sleeping in the guest room. A.P.H. never saw defendant's penis during those times because the room was dark, and she would just move away. A.P.H. told defendant once about his penis touching her leg, and he said that he was sorry about that. At times, A.P.H. wore just underwear to bed. Sometimes defendant accidentally touched her on her thighs

or on top of her underwear, and then he would move over. Defendant's hand never went inside her underwear.

¶ 23    A.P.H. told her mom about the game and told her not to tell defendant, but her mom did anyway. A.P.H. did not think that it was good that she told her mother, because, otherwise, "[n]one of this would have happened," her dad would still be there, and "[n]o one would be mad."

¶ 24    The State rested, and defendant moved for a directed verdict, primarily on the basis that A.P.H. did not testify in court as to any unlawful conduct by defendant. The trial court denied the motion. On March 19, 2014, the jury found defendant guilty of all four counts of aggravated criminal sexual abuse.

¶ 25                    B. Defendant Granted a New Trial

¶ 26    On April 17, 2014, defendant filed a motion for judgment notwithstanding the verdict, or for a new trial. Defendant argued, among other things, that the trial court erred in allowing into evidence A.P.H.'s hearsay statements to Marmo, Ryan, and Hawley under section 115-10 because A.P.H. failed to testify at trial as to any wrongful or unlawful conduct by him. Defendant argued that the trial court similarly erred in allowing into evidence the recording and transcript of A.P.H.'s interview with Hawley.

¶ 27    On June 18, 2014, the trial court granted defendant's request for a new trial. It stated that because A.P.H. did not testify that defendant engaged in any of the actions forming a basis for the charges against him, she did not testify for the purpose of admission of evidence pursuant to section 115-10, making the admission of evidence under that section erroneous. It therefore granted defendant a new trial.

¶ 28    Defendant then filed a motion arguing that a second trial would violate his constitutional right against double jeopardy, which the trial court denied on September 4, 2014. The case was

called for a re-trial over one year later, on December 2, 2015. The same day, defendant filed a motion to dismiss based on double jeopardy, reasserting his prior arguments. The trial court denied the motion, and defendant appealed. We affirmed, holding that double jeopardy did not prohibit a retrial, even if the evidence at the first trial was insufficient. *Hemphill*, 2016 IL App (2d) 151196-U, ¶¶ 36-37.

¶ 29                                          C. Second Trial

¶ 30                                          1. Recording

¶ 31     In March 2016, the State tendered to defendant a recording that Ryan had secretly made on January 5, 2012. The police obtained the recording from Ryan on December 2, 2015. The recording was many hours long and covered her discussion with defendant during A.P.H.'s tae kwan do class, A.P.H.'s subsequent statements, and police officers' statements when they came to the house. On February 24, 2017, defendant sought to suppress the recording. He filed a separate motion arguing that due to the failure to disclose the recording, the charges against him should be dismissed, or Ryan should be barred from testifying in the second trial.

¶ 32     At a hearing on May 5, 2017, the State asserted that it did not learn of the recording until one of its meetings with Ryan, after a continuance for the second trial had been granted. The State then immediately obtained a copy and thereafter provided it to defendant. The State represented that it did not anticipate using the recording at the second trial. Defense counsel stated that he would have proceeded differently in the first trial, including in his cross-examination of Ryan, had he known of the recording. On May 10, 2017, the trial court denied defendant's motion to suppress. It stated that there was no evidence that the State knew of the recording prior to the first trial, even though the State used due diligence to ensure that it would be aware of such evidence, and that the State promptly notified defendant after learning of the tape's existence. The trial court stated that

even if the State had violated discovery rules, the proper remedy would not be dismissal of the charges but rather to provide defendant with more time to prepare for trial. The trial court stated that because defendant had the recording in his possession since March 20, 2016, he had ample time to get ready for trial.

¶ 33                           2. Section 115-10 Motion

¶ 34    Also on February 24, 2017, defendant filed a motion seeking to bar the admission of the section 115-10 statements. He argued that he was receiving a new trial because the trial court ruled that these statements should not have been admitted in the first trial as A.P.H.'s testimony failed to accuse him of wrongdoing. Defendant argued that "[s]ince there was no direct evidence to support the allegations set forth in the Indictment, the State has failed and cannot present sufficient evidence to support the admission of the 115-10 testimony at a second trial." He argued that "[b]y reason of the fact that the 115-10 testimony fail[ed] to corroborate any allegations of wrongdoing, it [was] neither reliable nor admissible."

¶ 35    The trial court denied the motion on May 10, 2017. It stated that a court may make a reliability determination under section 115-10 without the child's testimony and that A.P.H.'s failure to testify as to any specific acts was based on the State's line of questioning, as opposed to her testifying that nothing happened with her and defendant in bed. The trial court stated that A.P.H.'s testimony therefore did not affect the determination that the time, content, and circumstances of the prior statements provided sufficient safeguards of reliability.

¶ 36                           3. Additional Charges

¶ 37    On July 31, 2017, the State charged defendant with an additional four counts of aggravated criminal sexual abuse (eight counts total) and four counts of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2012)). Counts 1 through 4 were the original charges, and

counts 5 through 10 charged defendant with predatory criminal sexual assault of a child. Counts 5, 6, and 7 alleged that defendant, who was over 17, committed an act of sexual penetration in that he put his penis in the mouth of A.P.H., who was under 13. Counts 8 through 10 alleged that he put his penis on her vagina. Counts 11 through 14 alleged aggravated criminal sexual abuse in that defendant put his penis on A.P.H.'s arm for sexual gratification (counts 11 and 13) and on her face (counts 12 and 14).

¶ 38                                4. Word Cards

¶ 39    Prior to defendant's second trial, the State filed a motion asking that A.P.H. be allowed to testify with visual aids, specifically to be allowed to use cards with the words "penis," "testicle," and "vagina" instead of saying these words out loud. The trial court addressed the motion on November 5, 2018, before beginning defendant's bench trial. The State stated that during A.P.H.'s 2017 interview at the Children's Advocacy Center (CAC interview) as well as in interviews with the prosecutor, A.P.H. did not speak the aforementioned words because she associated them with terrible things. The State asserted that it had 11 clips of the 2017 CAC interview where A.P.H. refused to use the words and resorted to using hand signals. The State argued that the words were important to the case and that using the cards would aid in A.P.H.'s testimony and enhance defendant's ability to cross-examine her. Defense counsel objected, stating that A.P.H. was 14 years old and did not suffer from a disability. He argued that A.P.H. could instead use slang terms or her own words and that using the word cards would affect the ability to assess A.P.H.'s demeanor and credibility. The trial court ruled that the cards were demonstrative evidence that would assist the trier of fact in understanding A.P.H.'s testimony. It stated that the dangers of confusion or any other negative effects would be mitigated because defendant was having a bench trial, and it would be paying attention to A.P.H.'s demeanor and the manner in which she testified.

¶ 40                                    5. Testimony

¶ 41    The State informed the court that it would not be prosecuting two of the counts of predatory criminal sexual assault of a child, specifically counts 9 and 10. A.P.H. then provided the following testimony. She was 14 years old and a freshman in high school. She lived with her mother and stepfather in Plainfield. In the days leading up to her eighth birthday, she lived in Montgomery with her mother and defendant. She saw an ant on the top of her bottom bunk bed, so she did not want to sleep in her bed anymore. A.P.H. therefore began alternatively sleeping with Ryan, who slept in the extra room, and defendant, who slept in the master bedroom. At school around that time, A.P.H. had heard from other kids that kissing caused pregnancy. That did not seem right to her because her parents kissed, but she did not have a sibling.

¶ 42    The assistant state's attorney asked if A.P.H. knew the difference between a man's and a woman's private parts. She answered in the affirmative. He asked if she was comfortable saying those words out loud, and she replied no. In response to questioning, she testified that she would be more comfortable using the word cards. The assistant state's attorney showed her drawings of a man and woman with different parts highlighted, and A.P.H. identified the highlighted parts with the word cards.

¶ 43    A.P.H. then continued with her testimony. Shortly before her eighth birthday, she was in defendant's home office while he was there. On the monitor, she saw a woman's mouth on a man's "penis."[2] She may have seen something like that previously in a movie. Defendant turned off the monitor. The image confused A.P.H. and made her curious.

_____

    [2] A.P.H. used the word cards with "penis," "testicles," and "vagina" throughout her testimony, rather than saying these words out loud. We use quotations to indicate when she used

¶ 44    One night shortly thereafter, while getting in bed with defendant, she asked him if kissing made a woman pregnant. He said no, and she asked how babies were created. Defendant explained the process to her, "[l]ike in health class." Defendant was wearing boxers, and he showed her his penis through the opening in the boxers. It was the first time A.P.H. had seen an adult male penis. He then played a game where he put his "testicles" around his "penis," and the penis was supposed to be a present. The same night, A.P.H. put her hand on defendant's "penis," which was hard. She did not keep her hand still but rather "[m]oved it" at defendant's request. She put her hand on defendant's penis on more than two other nights.

¶ 45    Also, on a night leading up to her eighth birthday, defendant put his pinky finger in her mouth before putting his "penis" in her mouth. His penis was hard. The first time, A.P.H. said that it tasted bad. Defendant said that there was something that could help, but they could not use it because Ryan would smell it. Defendant put his penis in her mouth on more than two different nights.

¶ 46    On another night around the same time, defendant put his penis in her "vagina." A.P.H. was awake and sitting on the bed when this happened. Defendant's penis was hard, and he asked her if it felt good. She said no. This occurred one time.

¶ 47    There were also times when A.P.H. was sleeping with defendant when she woke up in the middle of the night and noticed that defendant was touching her with his "penis." He did this on the side of her body and on her face, each more than once.

_____

a word card. Where these words do not have quotations marks, A.P.H. was responding to the assistant state's attorney's questions that used those words.

¶ 48    The last time defendant put his penis in A.P.H.'s mouth, he was standing at the end of the bed, and he asked her to get a towel so the sheet would not get dirty. He put the towel on the end of the bed and touched his "penis." A.P.H. saw something come out and go on the towel. Defendant told her not to tell Ryan, but A.P.H. did not remember if he said why. A.P.H. did not sleep with defendant that night but rather went into the bathroom, where Ryan was, and talked to her.

¶ 49    A.P.H. did not remember where the family went for her birthday, or what she did after school that day. Around that time, she and Ryan would bathe together on occasion, with Ryan facing her in the tub. Ryan did not talk to A.P.H. about body parts at these times. However, A.P.H. was watching a lot of scary movies, and Ryan would explain what was happening if there was a "make-out scene." A.P.H. remembered testifying at a prior trial, and she agreed that she did not previously testify that she touched defendant's penis with her hand or that he touched her vagina. Aside from the trial, A.P.H. had talked to other people about defendant's conduct, and she did not tell them these things, either.

¶ 50    A.P.H. met with "Mu"[3] in July 2017, before the current trial, and they recapped her previous testimony. Mu said that A.P.H. "need[ed] to talk more, like not freeze up," which was what had happened in the first trial. A.P.H. made additional allegations against defendant after meeting with Mu, but it came from information that A.P.H. had been holding for several years. She had not previously thought about the other incidents before 2017. Prior to making the new allegations, A.P.H. had looked at porn sites. Defense counsel asked what kind of porn sites A.P.H. had been looking at, and the State objected. The trial court overruled the objection but stated that counsel was "not going to have a long leash on this." A.P.H. answered "I don't know" to the

_____

[3] The parties stipulated that "Mu" was Assistant State's Attorney Nemura Pencyla.

questions of what kind of porn sites she was looking at and whether the sites had men and women. A.P.H. also did not know if Ryan had said that adult male testicles were like two balls with hair around them.

¶ 51 Ryan provided testimony consistent with her testimony in the first trial regarding the family's sleeping arrangements and A.P.H.'s statements to her while taking a bath. Ryan additionally provided the following testimony. She was familiar with A.P.H.'s description of defendant pulling his testicle skin over his penis because defendant had done that in front of Ryan numerous times after having sex. A.P.H. said that she had played that game and also the game where they pretended that defendant's penis was a marker many times.

¶ 52 Ryan planned to confront defendant the next day during A.P.H.'s tae kwon do class. In preparation, she cued up an e-mail that would automatically be sent to her mother the next morning saying that if she received the e-mail, Ryan had confronted defendant, and something bad had happened. Ryan also hid a small voice recorder in her bra. It recorded everything that was said that evening, up until Ryan went to bed. The State played two excerpts from the recording. In the first one, Ryan described the game with the testicle skin to defendant and said that he had also done that with Ryan, and defendant began breathing hard and crying. In the other excerpt, Ryan had A.P.H. explain what she told her in the bathtub about the games. Defendant asked A.P.H. who she did this with, and she said "you and me." Defendant then began to cry.

¶ 53 Ryan had talked with defendant about calling the police, and he said that the police would not even look at anyone else and would "crucify" him. Ryan contacted the police later that night, and they just took some information and said that someone would contact her to set up an interview for A.P.H. Defendant was not taken into police custody, but "the decision was that he would leave

the house for the night." He came back to the house only once after that, to get his things. The following month, Ryan filed for divorce.

¶ 54　When Ryan and defendant were married, they used two sexual aids that had aromas. One was a minty menthol gel for oral sex, and the other was a fruity one that would get hot when you blew on it. They were kept in a box on a deep shelf in their closet, and to the best of Ryan's knowledge, A.P.H. had never seen them.

¶ 55　A.P.H. currently had a phone, and Ryan made it clear to her that Ryan would have access to the phone's search history. Before July 22, 2017, Ryan and A.P.H. had discussed the upcoming trial with the State's Attorney's Office. Sometime during the week of July 22, 2017, Ryan noticed from the search history that A.P.H. had looked at several videos on Pornhub on her phone. Ryan discussed the situation with A.P.H., who said that she would not look at porn sites again. On July 22, 2017, Ryan learned new information from A.P.H. about her contact with defendant. Ryan shared this information with the State's Attorney's Office.

¶ 56　At the first trial, Ryan did not mention the audio recording because no one asked her about it. She believed she told a detective about the recording when she gave her original statement. Her recollection was that she was told that it was not something they could use. Ryan did not think that the subject came up in the draft e-mail to her mother, which she never sent.

¶ 57　Buddy, Marmo, and Hawley provided testimony consistent with their testimony at the first trial. Buddy additionally testified that A.P.H. was identified as needing educational support. Hawley testified that during the course of her 2012 interview with A.P.H., A.P.H. used the word penis several times.

¶ 58　Defendant moved for a directed finding, and the trial court denied the motion. Defendant then testified; we summarize his testimony. During the time frame of December 1, 2011, to January

4, 2012, A.P.H. never asked about how pregnancy occurred, and he never had any sexual contact with her or showed her his penis. Defendant denied that he and Ryan used sexual aids together, but rather she had aids for herself. He had never pulled the skin surrounding his testicles over his penis. On January 4 or 5, 2012, there was no divorce pending between him and Ryan, but they talked about it frequently. Defendant wanted to divorce Ryan because he caught her showing her breasts to a man online in the summer of 2011, and she would not discuss it. After that they were like roommates, except when dealing with A.P.H.

¶ 59    Defendant left the house on January 5, 2012, because one of the officers said that it would be best if defendant left. Defendant also believed that he needed to let law enforcement do their job, and he did not want them to say that he had tainted the investigation in any way. Defendant admitted that he did not say anything on the recording after Ryan asked if he was going to tell her that A.P.H. was lying, that he did not say, "I didn't do that" when A.P.H. was talking about balls or mentioned pulling skin over the penis, and that he did not say anything when A.P.H. said "me and you." Defendant was silent on the recording when the allegations were made because he was terrified that people would believe the allegations and that he would end up dead or killed in prison.

¶ 60    Defendant's sister testified that she stayed with the family beginning on October 7, 2011, for three days. She spent time with defendant and A.P.H. together and Ryan and A.P.H. together, but not with all three of them at once. The atmosphere was "kind of tense." She did not know if the failure to interact was a long-term issue or a short-term fight.

¶ 61                                    6. Trial Court's Ruling

¶ 62    The trial court issued its ruling on November 7, 2018, stating as follows. It considered several factors in weighing A.P.H.'s and defendant's credibility. It considered their demeanor, physical appearance, manner in which they testified, and the substance of their testimony. It also

considered that there was no mention of additional allegations until July 2017, which was five years after the initial allegations and three years after the first trial. It considered A.P.H.'s demeanor during the VSI and her statements about regretting telling Ryan because of how it affected the family. The trial court considered that A.P.H. used word cards instead of verbally saying the words, and her physical movements and mannerism while using the cards. It had considered Ryan's recording for the sole purpose of the effect on defendant. It gave zero weight to the excerpts of the audio tape where defendant did not respond when A.P.H. was in the car because it was unwilling to label his silence as consciousness of guilt. It did give some weight to defendant's silence during the recording when Ryan and defendant were alone. Ryan said that A.P.H. had described pulling his testicles over his penis, and that Ryan knew what A.P.H. was talking about because defendant had jokingly done that when he and Ryan were in bed together after having sex. Defendant remained silent, which was contrary to his testimony that he had never done that before.

¶ 63    The trial court found that A.P.H. was credible in her claims considering the totality of the circumstances, and it found defendant guilty of all 12 charges.

¶ 64    Defendant filed a motion for judgment *n.o.v.* or for a new trial on December 5, 2018, and an amended motion on February 18, 2019. The trial court denied the motion on March 18, 2019. On May 1, 2019, it sentenced him to five years' imprisonment for each of the eight aggravated criminal sexual abuse charges, to run concurrently, and 10 years' imprisonment for each of the predatory criminal sexual assault of a child charges, to run consecutively, for a total of 45 years' imprisonment. On June 3, 2019, the trial court denied defendant's motion to reconsider his sentence.

¶ 65    Defendant timely appealed.

¶ 66                                    II. ANALYSIS

¶ 67                            A. Motion Taken with Case

¶ 68    We begin by addressing the State's motion to strike portions of defendant's brief; we ordered the motion to be taken with the case. The State argues that defendant's brief contains 45 footnotes, many of which are lengthy and contain substantive material, in violation of Illinois Supreme Court Rule 341 (eff. Oct. 1, 2020). The State maintains that some footnotes additionally contain material that is outside of the record, and other footnotes contain improper argument or comment. The State asks that we strike or disregard the footnotes, particularly certain footnotes that it specifies in its motion.

¶ 69    Defendant argues that motions to strike are disfavored, that his footnotes are not in violation of any Illinois Supreme Court Rules, and that "the footnotes are the only way to get Defendant's point across and give context" for the issues on appeal, given the complexity of the case with two trials spanning six years.

¶ 70    We note that defendant's brief contains 42 rather than 45 footnotes, but we agree with the State that such a volume of footnotes runs contrary to the rule that "[f]ootnotes are discouraged" (Ill. S. Ct. R. 341(a) (eff. Oct. 1, 2020)). We also agree with the State that some of the footnotes improperly contain material outside the record, and that other footnotes contain improper argument or comment. We will disregard the offending footnotes and caution defendant that future use of footnotes in this manner may result in the court striking them.

¶ 71                              B. *Brady* Violation

¶ 72    Turning to the merits, defendant first argues that the State violated *Brady* by failing to timely disclose Ryan's recording. Defendant argues that that the tape contained favorable evidence

demonstrating his innocence, and that had the State disclosed the tape before the first trial, defendant would have been acquitted, thus precluding the second trial.

¶ 73    The United States Supreme Court established in *Brady* that the State has a duty to disclose favorable evidence to a defendant where the evidence is material to either guilt or punishment, regardless of the good or bad faith of the prosecution. *Brady*, 373 U.S. at 87; see also Ill. S. Ct. R. 412(c) (eff. Mar.1, 2001) ("[T]he State shall disclose to defense counsel any material or information within its possession or control which tends to negate the guilt of the accused as to the offense charged or which would tend to reduce his punishment therefor."). Our supreme court has held that to establish a *Brady* violation, a defendant must show that: "(1) the undisclosed evidence is favorable to the accused because it is either exculpatory or impeaching; (2) the evidence was suppressed by the State either wilfully [*sic*] or inadvertently; and (3) the accused was prejudiced because the evidence is material to guilt or punishment." *People v. Beaman*, 229 Ill. 2d 56, 73-74 (2008). We review a trial court's ruling on a *Brady* claim for manifest error because it requires applying established law to facts. *Id.* at 73. Manifest error is error that is clearly evident, plain, and indisputable. *Id.*

¶ 74    The trial court ruled that the State had not violated discovery rules, as the State promptly informed defendant about the recording after learning of its existence. The trial court further stated that even if there was a discovery violation, the appropriate remedy would be to give the defense enough time to prepare for trial after learning of the recording, and that defendant had ample time to prepare for trial.

¶ 75    The State argues that the trial court's ruling was correct, especially considering that even assuming a *Brady* violation occurred, defendant had already received the appropriate remedy, a new trial, via other means. It argues that defendant cites no authority for the proposition that a

*Brady* violation could lead to a second trial being barred by double jeopardy, but rather federal courts have rejected such an argument. See *United States v. Lewis*, 368 F.3d 1102, 1107 (9th Cir. 2004) ("Barring a retrial for the prosecution's alleged intentional *Brady* violations would be an unnecessary expansion of the Double Jeopardy Clause."). The State additionally argues that defendant's attempt to relitigate the sufficiency of the evidence at the first trial is prohibited by our 2016 decision under the law-of-the-case doctrine, as we already held that because defendant's convictions were reversed due to trial errors, "there was no event terminating the original jeopardy, and a retrial is not prohibited, regardless of the sufficiency of the evidence at the first trial." *Hemphill*, 2016 IL App (2d) 151196-U, ¶ 34.

¶ 76　　Defendant responds, among other things, that he is not improperly linking a *Brady* violation to a double jeopardy claim. Rather, he is arguing that had the *Brady* evidence been timely disclosed, any reasonable fact finder would have found him not guilty at the first trial, such that a second trial would not have taken place. Defendant asserts that adding the tape to the already weak evidence at the first trial, which included A.P.H.'s testimony that he did not do anything wrong, would clearly have resulted in an acquittal. He argues that "portions of the recording establish beyond a shadow of a doubt that [he] is innocent."

¶ 77　　Defendant's argument is without merit. Assuming, *arguendo*, that a *Brady* violation occurred, "[t]he remedy for a *Brady* violation is a new trial" (*People v. Maiden*, 318 Ill. App. 3d 545, 547 (2001)), which is what defendant had already received due to other circumstances. Defendant does not claim that he did not have enough time to prepare for the second trial after receiving the recording, which is understandable considering that he obtained the recording on March 20, 2016, and his bench trial began over two years later on November 5, 2018. Defendant

cites no authority for the proposition that a *Brady* violation allows the court to reassess the evidence at the first trial and determine whether the withheld evidence would likely have led to an acquittal.

¶ 78    We also disagree with his characterization of the recording as clearly demonstrating defendant's innocence. Indeed, defendant sought to suppress the recording at the second trial, and even with the recording in evidence, he was still found guilty of all charges. The recording contained evidence supporting A.P.H.'s testimony, in that she described the game of putting the testicle skin around the penis, and the penis was supposed to be a present inside. Defendant asked who she did this with, and A.P.H. replied, "You and me." A.P.H. then mentioned the marker game. The trial court also specifically cited defendant's silence to some of Ryan's statements when they were alone in the car. The outcome in this case largely rested on a credibility determination between A.P.H. and defendant, and the recording could not have resolved this issue, even if defendant had adamantly denied the allegations the whole time.[4]

¶ 79    Accordingly, we find no manifest error in the trial court's ruling on defendant's *Brady* claim.

¶ 80                                 C. Section 115-10

¶ 81    Defendant next argues that the trial court erred in allowing the section 115-10 statements at the second trial. He argues that section 115-10 allows only hearsay statements as to charged acts, but the "2017 charges about oral sex, vaginal penetration and ejaculation bore no relation to the 2012 statements the adult witnesses attributed to [A.P.H.]" Defendant additionally asserts that the timing, content, and circumstances of the statements bar admission. He maintains that A.P.H. allegedly had a discussion with Ryan shortly after the alleged abuse, but then days and weeks

---

[4] We address the recording in more detail in other parts of the disposition.

passed before she allegedly made statements to Hawley and school personnel. Defendant compares this case to *People v. Zwart*, 151 Ill. 2d 37, 46 (1992) (three-year-old victim was interviewed by at least three people before she admitted that she was abused or implicated the defendant, which showed substantial adult intervention). He argues that the circumstances failed to provide required safeguards of reliability because Ryan forbade him from contradicting A.P.H.'s allegations in front of her; she asked leading questions of A.P.H. in the car; the responding officer assured A.P.H. that she had done nothing wrong and that defendant would not go to jail; and Hawley directed A.P.H. during the VSI and said that she could leave after they finished talking about the incident. Defendant contends that the record makes clear that A.P.H. was prompted and manipulated by several outsiders.

¶ 82    Regarding the content of A.P.H.'s statements, defendant argues that there was little consistency between what A.P.H. allegedly told Ryan, the school personnel, and Hawley. He argues that Ryan said that she talked about a penis game whereas school personnel did not mention such a game, but rather A.P.H.'s statements at school involved wanting a sibling and her parents divorcing. Defendant maintains that at school, A.P.H. said that she knew what being "hard" meant, but she did not say something similar to Ryan. Defendant also argues that at school A.P.H. said that defendant tried to get in bed with her, which was untrue and inconsistent with anything she said to anyone else.

¶ 83    Defendant argues that A.P.H.'s mental state further weighed against her reliability, in that she needed extra help at school, she told school personnel about "how her head talked to her in relation to her stories,"[5] she was obsessed about where babies came from, she repeatedly asked to

_____

[5] At the section 10-115 hearing, Lipke, the school principal, testified that when he entered

see defendant's penis, she frequently brought up the topic of sex, she may have watched pornography before her eighth birthday, she downloaded pornography at the age of 13, she had been estranged from defendant for almost six years before testifying that he did anything wrong, she took baths with her mother at "an advanced age," and she slept with her parents because she once saw an ant. Defendant additionally argues that A.P.H. had a strong motive to fabricate because defendant had to leave as a result of the bathtub conversation, with only Ryan remaining, and it was too late for A.P.H. to admit that she had told a fabricated tale or that Ryan had misinterpreted what she was saying.

¶ 84    The State maintains that defendant's initial argument that the section 115-10 testimony related to uncharged conduct is wholly unsupported by the record, as the four counts at issue in the first trial were also at issue in the second trial. The State further argues that the trial court's allowance of the section 115-10 statements was not an abuse of discretion.

¶ 85    Section 115-10 provides a hearsay exception for certain out of court statements made by a victim in child sexual offense cases. 725 ILCS 5/115-10(a) (West 2012). Admissible testimony includes "testimony of an out of court statement made by the victim describing any complaint of such act or matter or detail pertaining to any act which is an element of an offense which is the subject of a prosecution for a sexual or physical act against that victim." *Id.* 115-10(a)(2) (West

---

Marmo's office, A.P.H. said that "she was upset about her parents being divorced and sometimes she hears things and hears what her head is saying. And one day her head wasn't really saying anything. From what I can recall, it was one day her head wasn't talking to her, and then all of a sudden her parents were getting divorced."

2012). The testimony may be admitted only if (1) the trial court finds at a hearing conducted outside the jury's presence that the time, content, and circumstances of the statement provide sufficient safeguards of reliability, and, as relevant here, (2) the child testifies at the proceeding. *Id.* 115-10(b) (West 2012). "Among the factors to be considered in making a reliability determination are (1) the child's spontaneity and consistent repetition of the incident, (2) the child's mental state, (3) use of terminology unexpected of a child of a similar age, and (4) the lack of motive to fabricate." *People v. Cookson*, 335 Ill. App. 3d 786, 791 (2005). A trial court's decision to admit evidence under section 115-10 will not be reversed absent an abuse of discretion. *People v. Applewhite*, 2016 IL App (4th) 140558, ¶ 57. An abuse of discretion occurs where the trial court's determination is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the trial court's view. *Id.* ¶ 57.

¶ 86 The trial court made many findings regarding the section 115-10 statements. Regarding the statements in the bathtub, the trial court stated that A.P.H. initiated the conversation, Ryan's questioning was not inappropriate or leading, A.P.H. used terminology appropriate for her age, and the statements appeared to be completely voluntary and not the product of adult manipulation. The trial court made a similar finding about A.P.H.'s statements when she was in the car with her parents, additionally finding that A.P.H. and Ryan had no reason to fabricate the statements. For the VSI with Hawley, the trial court stated that Hawley generally asked appropriate open-ended questions of A.P.H. during the interview, but occasionally was required to redirect A.P.H. to get her to respond. The trial court stated that at one point, Hawley did say that after they finished talking about it, A.P.H. could go back to her mother. A.P.H. used consistent terminology. The trial court again stated that A.P.H had no reason to fabricate the statements, but in fact had reason to recant, as her statements caused defendant to move out of the family home. The trial court stated

that it would have been understandable if A.P.H. had recanted her statements in an attempt to reunify her family, but she did not. As for A.P.H.'s statements to Marmo, the trial court found that A.P.H. initiated the conversation and there was no evidence that Marmo asked her any leading questions, or that either of them had reason to fabricate.

¶ 87    We conclude that the trial court did not abuse its discretion in allowing A.P.H.'s prior statements into evidence under section 115-10. As the trial court pointed out, A.P.H.'s statements in the bathtub and to school personnel were spontaneous, and she did not have a motive to fabricate any of the statements. To the contrary, she expressed in her VSI that she wished she had not told Ryan anything because then "[n]one of this would have happened," her dad would still be there, and "[n]o one would be mad." We recognize that Hawley told A.P.H. at one point in the interview that after they finished talking, A.P.H. could go back to Ryan, but Hawley did so in an attempt to get A.P.H. to focus, and she asked A.P.H. open-ended questions. Further, Hawley made this statement more than halfway through the interview, after A.P.H. had already told Hawley most of what she had told Ryan. These considerations undermine defendant's argument that A.P.H.'s statements were prompted and manipulated by outsiders, and distinguish this case from *Zwart*. That A.P.H. needed extra help at school, was very scared of ants, or was curious about babies and body parts does not equate to a mental state that made her statements inherently unreliable.

¶ 88    The statements did not directly describe the elements of the predatory criminal sexual assault of a child charges, but defendant still faced the original aggravated criminal sexual abuse charges, in addition to others. Moreover, Buddy testified that A.P.H. reported sleeping with defendant, and Marmo testified that A.P.H. told her that she asked defendant about sex, that he had shown her "his parts," and showed her what being "hard" meant. These statements relate to all of the charges. Though defendant argues there was no evidence that he tried to get into A.P.H.'s

bed with her, Buddy testified that A.P.H. said that defendant asked her to sleep in his bed or asked her to sleep with him. We note that defendant never contradicted Ryan's and A.P.H.'s testimony that in the days leading up to her eighth birthday, A.P.H. was sleeping at times with Ryan and at other times with defendant. As for the timing of the statements, the bathtub conversation took place on January 4, 2012. A.P.H. spoke to Hawley less than one week later, on January 22, 2012, and told her substantially similar things, such as that defendant showed her his penis, that he let her touch it, that that they played the marker game, and that defendant told A.P.H. not to tell Ryan or he could go to jail. A.P.H.'s conversations with school personnel occurred less than one week of her interview with Hawley. It is logical that A.P.H. mentioned her parents divorcing to Marmo but not during the bathtub incident, as Ryan testified that her relationship with defendant had been good, and that she filed for divorce after A.P.H.'s outcry. In sum, we cannot say that the trial court's allowance of the section 115-10 was arbitrary, fanciful, or unreasonable, or that no reasonable person would take the trial court's view.

¶ 89                    D. Sufficiency of the Evidence

¶ 90     Defendant's third argument on appeal is that the State presented insufficient evidence on which to base any of the convictions. Defendant argues that the trial court failed to consider various issues, namely A.P.H.'s prior testimony that nothing happened; his refusal of Ryan's invitation to "let it go"; Ryan's direction to defendant that he must not suggest to A.P.H. that she was lying; his refusal to confront A.P.H. without Ryan's presence for fear that he would make her feel bad or appear to coerce her; the multiple inconsistencies between Ryan's and A.P.H.'s version of what happened in the bath; the complete unbelievability that anyone would sexually assault a child vaginally and orally, then masturbate to a climax while engaging in a discussion about how to enhance the ejaculate's flavor, while in an unlocked bedroom with the child's mother just across

the hall; his character and history suggesting that he was incapable of such conduct; Ryan's flashing of her breasts online, immediate divorce, remarriage, and full custody of A.P.H. "after successfully driving [defendant] from the home"; the responding officer's immediate belief that defendant was guilty; the police officer's assurances to A.P.H. that she had done nothing wrong and was not in trouble; Ryan's "reward" to A.P.H. of a day off of school; and that Ryan told A.P.H. that defendant believed A.P.H. and agreed that what she said happened actually occurred.

¶ 91    Defendant argues that the trial court found defendant guilty because he allegedly did not respond when Ryan said that she and defendant had played the penis game. Defendant argues that in the recording, he either says "Yea" or "Nope" when Ryan says that defendant had previously, as a joke, taken his testicle skin and stretched it over his penis to hide his penis. Defendant argues that when Ryan said that it was like covering up his penis with a blanket, he replied, "That's disgusting."[6] Defendant argues that the recording shows that he did not know what Ryan was talking about, and when she explained further, he was not silent, but rather said that it was disgusting. According to defendant, later in the recording, Ryan mentioned the same game, and defendant replied, "That doesn't make sense." Shortly thereafter, defendant said, "We have never played that kind of game so she couldn't have overheard," and Ryan replied, "Nope." Defendant argues that the conversation makes clear that he and Ryan had never played the game.

¶ 92    Defendant further points to A.P.H.'s testimony that the prosecutor reviewed her prior testimony before defendant's second trial and told her that she needed to say more. Defendant argues that, for this reason, A.P.H. watched several pornographic movies and only then came up

---

[6] Defendant's comment of "That's disgusting" actually occurs elsewhere in the recording, which we subsequently discuss.

with allegations that completely contradicted her prior testimony and section 115-10 statements, and involved vaginal penetration and oral sex. Defendant argues that he was offered a deal on the eve of the second trial where he would avoid jail and prison, but he refused to plead guilty because he was innocent. Defendant argues that the State needed to use word cards at the trial to carry its burden, demonstrating the weakness of its evidence. Defendant asserts that the prosecutor led A.P.H. through the entirety of her testimony with questions that required only using the word cards or responding in the affirmative. Defendant argues that A.P.H. also provided inconsistent testimony, such as testifying that his penis was the first adult male penis she had seen, even though she had testified that she had previously seen one on his computer monitor and "probably" in a movie. Defendant argues that the video could have been the basis for A.P.H.'s statements during the bathtub conversation. Defendant also highlights her testimony that after he ejaculated onto a towel, she went into the bathroom and told Ryan, which contradicts Ryan's testimony about the bathtub conversation. Defendant further points out that A.P.H. testified that she and Ryan never talked about male body parts yet also testified that Ryan had explained movie "make-out" scenes. Defendant asserts that it is clear from the recording that A.P.H. frequently talked about sexual organs with both parents. He argues that the recording further reveals that he never tried to stop Ryan from calling the police, but rather, when A.P.H. asked if they could just let everything go, he responded, "No. It's pretty serious [A.P.H.]. We can't just forget it."

¶ 93    Defendant additionally argues that A.P.H. exhibited severe memory problems such as not remembering going out to dinner or taking a bath with Ryan on A.P.H.'s birthday, or even whether the pornography videos she viewed involved men and women. Defendant reasserts his argument about A.P.H.'s mental state, and he points out that Ryan did not disagree on the recording when he stated that A.P.H. insisted that something was true if she was confronted about it. Defendant

argues that one can reasonably infer that because A.P.H. thought that both of her parents believed whatever the bath story had morphed into, she stuck to it. He also asserts that the record reveals that A.P.H. never looked at the judge while testifying, and that she spoke so softly that the prosecutor had to repeatedly tell her to speak up, both of which decrease her credibility. Defendant contends that contrary to the State's theory, his and Ryan's marriage was all but finished, including that defendant initially thought that Ryan wanted to have a private conversation with him because she did not love him anymore and was leaving him.

¶ 94     The State argues that defendant improperly references numerous parts of the record that do not fall within the realm of evidence adduced at trial, including testimony from the section 115-10 hearing, testimony from the first trial, argument at different hearings, and evidence from sentencing. The State asserts that defendant also refers to plea negotiations, which is not only irrelevant but is also unsupported by citations to the record. The State further argues that defendant cites numerous portions of the recording that were not presented by either party at trial or admissible as substantive evidence. That State argues that the trier of fact had all of the relevant information before it and opted to believe A.P.H., and that we have no basis to disturb that finding.

¶ 95     When examining the sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Collins*, 106 Ill. 2d 237, 261 (1985). The trier of fact has the responsibility to assess witnesses' credibility, weigh their testimony, resolve inconsistencies and conflicts in the evidence, and draw reasonable inferences from the evidence. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). We will not reverse a criminal conviction based on insufficient

evidence unless the evidence is so unreasonable, improbable, or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Gray*, 2017 IL 120958, ¶ 35.

¶ 96    We agree with the State that we are limited to looking at the evidence from defendant's second trial in assessing whether there was sufficient evidence. However, we disagree that we may consider only the portions of the recording that the State played for the trial court, as the entire recording was admitted into evidence without limitation. Indeed, in closing argument, the State argued that defense counsel was wrong to suggest that the recording contained parts that would help defendant, as "the whole recording was admitted into evidence. The entire thing." We also note that although defendant argues that A.P.H.'s direct examination was overly leading, he does not cite objections to the questions in the record.

¶ 97    We conclude that, viewing the evidence in the light most favorable to the State, there was sufficient evidence to prove defendant guilty of all charges beyond a reasonable doubt. According to Ryan, prior to A.P.H.'s birthday, A.P.H. began sleeping with Ryan and defendant on different days because she was scared to sleep in her own bed. Ryan testified that when she was giving A.P.H. a bath on her birthday, A.P.H. said that she knew the difference between girls' and boys' parts and that she had seen and touched defendant's private parts at her request. A.P.H. said that there was a part with soft skin and hair on it, with two balls inside, and another part that stuck out in the front, with a hole in it where the pee came out. A.P.H. then described a game where defendant stretched the skin of the testicles over the penis, and the penis was a present or a piece of candy inside.

¶ 98    Defendant argues that on the recording he denied playing such a game, but after Ryan said that defendant had stretched his testicle skin over his penis in front of her, she asked, "You know what I am talking about, right?", and defendant simply made a monosyllabic response that sounded

like "Yeah." He did not say anything else showing that he did not know what Ryan was talking about. Further, defendant did not say that this game was disgusting, but rather made this comment previously in the recording, after Ryan said that A.P.H. described a penis very graphically. Later in the recording, Ryan talked about putting the testicle skin over the penis and opening it like it was a present, and sometimes it was a piece of candy for A.P.H. At that point defendant said, "That doesn't make sense." He then said that he and Ryan had never played that kind of game, so A.P.H. could not have overheard, and Ryan agreed, saying, "Nope." This exchange can be interpreted as defendant and Ryan agreeing that they had not played the type of game where they pretended that releasing the testicle skin was like opening a present, with the penis being like a piece of candy inside.

¶ 99    In any event, regardless of whether defendant acknowledged on the recording having previously engaged in such actions, Ryan testified that defendant had pulled his testicle skin over his penis numerous times in front of Ryan after having sex. Ryan testified that A.P.H. described another game where the penis was a marker. She also said that if Ryan told anyone what she said, defendant could go to jail.

¶ 100   Ryan's recording of defendant and A.P.H. in the car includes A.P.H.'s description of the game with the testicle skin over the penis, and when defendant asked who she did this with, A.P.H. replied, "You and me." A.P.H. also briefly talked about the marker game and defendant saying he could go to jail. In A.P.H.'s VSI with Hawley, she described asking defendant about how pregnancy occurs, his explanation, her asking to see his penis, defendant showing her his penis by pulling it out through the hole in his pajama shorts, A.P.H. asking to touch it, and defendant letting her. A.P.H. also described the marker game to Hawley and defendant saying that if A.P.H. told Ryan, he could go to jail. Marmo testified that A.P.H. told her that she had asked defendant about

boy and girl parts, and that he had shown her his parts. She also told Marmo that defendant showed her what it meant to be "hard" and that there was a lot more she could not tell her. All of this evidence supported A.P.H.'s testimony at trial that in the days leading up to her eighth birthday, she asked defendant while getting in bed with him how babies were created. A.P.H. testified that he explained the process and showed her his penis through the opening in his boxers. A.P.H. testified that they played a game where defendant put his testicle around his penis, and the penis was supposed to be a present. She testified that she touched defendant's penis, and it was hard.

¶ 101   A.P.H. additionally testified that defendant told her to move her hand on defendant's penis on more than two nights. She further testified that defendant put his pinky in her mouth one night before putting his penis in her mouth. When A.P.H. told him that it tasted bad, he said that there was something that could help, but they could not use it because Ryan would smell it. Ryan correspondingly testified that she used two sexual aids with defendant that had aromas, one of which was a minty menthol gel for oral sex. A.P.H. testified that defendant put his penis in her mouth on more than two different nights. She also testified that he put his penis in her vagina one time and asked if it felt good, and she said no. A.P.H. testified that she more than once woke up to defendant touching her with his penis on the side of her body and on her face. A.P.H. further described defendant ejaculating onto a towel on the bed. A.P.H. acknowledged that she had not told anyone of these actions before 2017 but testified that it was information that she had been holding for several years.

¶ 102   The "testimony of a single witness is sufficient to sustain a conviction if the testimony is positive and credible, even if it is contradicted by the defendant." *People v. Harris*, 2018 IL 121932, ¶ 27. Defendant highlights various inconsistencies and conflicts in the evidence and challenges A.P.H.'s credibility, but it was up to the trier of fact to resolve these issues. *Sutherland*,

223 Ill. 2d at 242. Viewing all of the evidence in the light most favorable to the State, a rational trier of fact could have found defendant guilty beyond a reasonable doubt of all charges.

¶ 103                                    E. Evidentiary Issues

¶ 104   Defendant next argues that the trial court erred in limiting cross-examination regarding A.P.H.'s viewing of pornography, allowing her to testify with suggestive cue cards, and in failing to review or ignoring the secret recording. We examine each issue in turn.

¶ 105                          1. Cross-Examination on Pornography

¶ 106   Defendant argues that A.P.H. added graphic accusations of sexual assault only after watching pornography, such that his counsel should have been permitted to explore her pornography viewing without limitation. Defendant notes that when defense counsel asked A.P.H. if she had searched porn sites, she responded, "That's my business. But yeah." When defense counsel asked what kind of site she had been looking at, the State objected based on relevance. The trial court overruled the objection but said that defense counsel was "not going to have a long leash on this."

¶ 107    Defendant cites *People v. Phillips*, 186 Ill. App. 3d 668, 678 (1989), where the court stated that "[d]efense counsel is generally allowed wide latitude in cross-examining State witnesses for the purpose of showing their bias or motive to testify falsely, but the evidence upon which such inquiry by defense counsel is based cannot be remote or uncertain." Defendant contends that the State's position was that A.P.H. was telling the truth because she otherwise could not have described his penis and the sexual acts he perpetrated upon her. Defendant argues that his theory was that A.P.H.'s pornography "habit" was the basis of her new testimony, rather than anything that had transpired between them years earlier, and that this theory was not remote or speculative. Defendant argues that A.P.H. was the only witness to the source of the new allegations, and the

case hinged on her credibility, so there should not have been any leash at all, much less a short leash. He cites *People v. Mason*, 219 Ill. App. 3d 76 (1991),[7] where the court held that the trial court erred in refusing evidence that the child victim had watched sexually explicit videotapes, as it was evidence relevant to the source of the child's knowledge of sexual conduct. Defendant asserts that exploration of the topic was also necessary to show A.P.H.'s motivation to lie, as after A.P.H. was caught watching pornography, she decided to transform herself from a child deserving punishment into a victim deserving sympathy by creating new allegations against defendant.

¶ 108   The State argues that defendant had forfeited this issue because he failed to object at trial and also did not raise the issue in his posttrial motion. See *People v. Denson*, 2014 IL 116231, ¶ 11. The State also argues that defendant has not raised the issue of plain error, thereby forfeiting plain error review on this claim. See *People v. Hillier*, 237 Ill. 2d 539, 545-46 (2010). On the merits, the State argues that the trial court did not limit defense counsel's ability to question A.P.H. about any pornography she viewed.

¶ 109   In his reply brief, defendant argues that if he failed to preserve his argument, we should review it for plain error. He cites *People v. Williams*, 193 Ill. 2d 306, 347-48 (2000), where our supreme court stated that a defendant may raise the issue of plain error for the first time in a reply brief.

¶ 110   The sixth amendment gives a criminal defendant the right "to be confronted with the witnesses against him." U.S. Const., Amend. VI. The Illinois Constitution contains the same

---

[7] Defendant additionally cites a 2018 unpublished case, but only nonprecedential orders entered on or after January 1, 2021, may be cited for persuasive purposes. Ill. S. Ct. R. 23(e)(1) (eff. Jan. 1, 2021).

language. Ill. Const. 1970, Art. I, § 8 (amended Nov. 8, 1994). "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig*, 497 U.S. 836, 845 (1990). However, the "Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." (Emphasis in original.) *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985). A trial court may impose reasonable limits on cross-examination to assuage concerns about harassment, prejudice, jury confusion, witness safety, or irrelevant questioning, though it must exercise its discretion to allow a defendant wide latitude to establish witness bias, motive, or interest. *People v. Pacheco*, 2021 IL App 3d 150880-B, ¶ 66. We review a limitation by the trial court of cross-examination for an abuse of discretion. *People v. Johnson*, 2020 IL App (1st) 162332, ¶ 82.

¶ 111    We agree with the State that defendant failed to preserve this issue for review because he did not object at trial and raise the issue in his posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). However, we also agree with defendant that he may assert plain error for the first time in his reply brief. See *Williams*, 193 Ill. 2d at 347-48. The plain error doctrine allows a reviewing court to consider an unpreserved error where either (1) a clear error occurs and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, or (2) a clear error occurs that is so serious that it affected the trial's fairness and challenged the integrity of the judicial process. *People v. Sebby*, 2017 IL 119445, ¶ 48. The first step in a plain error analysis is to determine whether a clear or obvious error occurred. *People v. Jackson*, 2021 IL App (1st) 180672, ¶ 21.

¶ 112    We conclude that the trial court did not abuse its discretion, as its ruling that defense counsel would have not have a "long leash" on the issue did not impede defense counsel's cross-examination of A.P.H. Counsel asked what kind of pornography sites A.P.H. looked at, and she answered that she did not know. He asked if there were sites with men and women, and she gave the same answer. He asked if she did not remember or did not want to remember, and she replied that she did not remember. Defense counsel then moved on to another topic, showing that he was not hampered in any way in his cross-examination by the trial court's ruling, but rather by A.P.H.'s responses. Moreover, A.P.H.'s statement that she did not even know whether the sites had men and women could arguably impact her credibility, making it preferable to cease questioning her on the issue. Defense counsel was also able to argue in closing that A.P.H.'s additional allegations were consistent with what she viewed on pornographic websites.

¶ 113    Defendant alternatively argues that if the trial court did not abuse its discretion in applying a "short leash," then defense counsel was ineffective for not pressing the matter. He argues that counsel failed to determine what A.P.H. watched and show that it was the basis for her revised accusations against him.

¶ 114       For a claim of ineffective assistance of counsel, a defendant must satisfy the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Hodges*, 234 Ill. 2d 1, 17 (2009). The defendant must first establish that, despite the strong presumption that trial counsel acted competently and that the challenged action was the product of sound trial strategy, counsel's representation fell below an objective standard of reasonableness under prevailing professional norms such that he or she was not functioning as the counsel guaranteed by the sixth amendment. *People v. Manning*, 227 Ill. 2d 403, 416 (2008). Second, the defendant must establish prejudice. *People v. Valdez*, 2016 IL 119860,

¶ 14. In most situations this is done by showing a reasonable probability that the outcome of the proceeding would have been different absent counsel's errors. *Id*. A failure to establish either prong of the *Strickland* test precludes a finding of ineffectiveness. *People v. Peterson*, 2017 IL 120331, ¶ 79.

¶ 115   We conclude that defendant cannot establish either prong of the *Strickland* test. He cannot show that defense counsel's representation was unreasonable because, as stated, A.P.H.'s statement that she did not know whether the porn sites even contained men and women arguably decreased her credibility on the issue, and given the lack of detail, counsel was able to argue in closing that A.P.H.'s new allegations were based on the pornography that she viewed. Defendant also cannot show prejudice because A.P.H. already stated that she did not remember what she saw, such that additional questioning on this issue was unlikely to elicit more detail.

¶ 116                                     2. Word Cards

¶ 117   Defendant argues that in allowing the State to use word cards with A.P.H., the trial court improperly permitted the State to obtain another advantage at the expense of his rights and the pursuit of justice. Defendant asserts that this ruling amounted to the State improperly leading the key witness in the case. Defendant argues that even assuming that such assistance would be appropriate for a young child, it was not appropriate for A.P.H. because she knew the actual terms from a young age, was educated about sex, and had viewed pornography. Defendant points out that the trial court stated that the way to minimize any suggestive nature of the cards was to have non-suggestive questioning by the State, but defendant argues that in addition to the cards, the State led A.P.H. through all of her accusations, repeatedly obtaining one-word answers of "Yeah" from her. Defendant asserts that it is also notable that A.P.H. was not presented with any cards to

state that he had not touched her improperly anywhere. According to defendant, the cards created A.P.H.'s testimony rather than serving as demonstrative evidence to explain her testimony.

¶ 118  The State argues that defendant has forfeited his claim that the use of the cards resulted in improper leading questions, as defendant objected to only a limited number of questions on the basis that the questions were leading, and he did not include this claim in his motion for a new trial. The State further notes that during argument, defense counsel stated that he was not accusing the State of leading A.P.H. with the word cards. The State argues that the trial court did not abuse its discretion in allowing A.P.H. to use the cards as demonstrative evidence, and even if error existed, it would be harmless because the trial court concluded that the cards had very little impact on its decision and resulted in no unfair prejudice to defendant.

¶ 119  We disagree with the State that defendant forfeited any portion of his argument, as he strongly objected to the use of the word cards and included the issue in his posttrial motion. In ruling on the issue of the word cards in defendant's posttrial motion, the trial court stated that the word cards served to allow A.P.H. to express herself "in a more succinct manner," that the use of the cards had very little effect on the trial, that the cards enhanced defense counsel's ability to confront and cross-examine her, and that there was no unfair prejudice to defendant.

¶ 120  We agree with the State that the use of the word cards was akin to allowing demonstrative evidence. Demonstrative evidence has no inherent probative value but rather serves as a visual aid to the trier of fact in comprehending a witness's testimony. *People v. Middleton*, 2018 IL App (1st) 152040, ¶ 32. "The overriding considerations in admitting demonstrative evidence are relevancy and fairness." *Id.* Whether to allow demonstrative evidence is within the trial court's discretion, and we review the trial court's ruling for an abuse of discretion. *People v. Holman*, 402 Ill. App. 3d 645, 650 (2010).

¶ 121   The Supreme Court has recognized that the State has a compelling interest in protecting child victims of sex from additional trauma and embarrassment (*Maryland v. Craig*, 497 U.S. 836, 852 (1990)), which permits special accommodations for them, such as allowing a child to testify via closed circuit television (*id.* at 855-56). In *People v. Roman*, 260 Ill. App. 3d 436, 445-46 (1992), the appellate court held that it is permissible for child sexual abuse victims to use anatomically correct dolls as testimonial aids. The use of comfort dogs in the courtroom for child sexual abuse victims has also been upheld in some jurisdictions. See *People v. Tapley*, 2020 IL App (2d) 190137, ¶ 80 (citing *People v. Tohom*, 109 A.D.3d 253, 268 (N.Y. App. Div. 2013) (a comfort dog's accompaniment of the 15-year-old alleged victim "did not adversely affect the defendant's due process right to a fair trial or compromise his constitutional right of confrontation)). In *People v. Spencer*, 119 Ill. App. 3d 971, 979 (1983), the court stated that "a witness's inability to speak does not render her incompetent to testify or violate the defendant's right to cross-examine witnesses so long as she is able to communicate the facts by other methods and otherwise meets the tests of legal competency." Finally, in *Harrison v. Thackaberry*, 248 Ill. 512, 517 (1911), our supreme court held that the trial court did not err in allowing the plaintiff's attorney to examine him as a witness by writing down questions and handing them to the plaintiff, who was very hard of hearing. The court stated that the "testimony of such a witness may be given by whatever means are necessary and best adapted to obtain accurate information," and that "[s]uch matter must rest largely in the sound discretion of the trial court." *Id.* We recognize that not all of these cases involve demonstrative evidence, but they illustrate the accommodations a trial court may make for witnesses, and the special measures that may be employed for child witnesses who are alleged victims of sexual assault.

¶ 122   With this backdrop, we conclude that the trial court did not abuse its discretion in allowing A.P.H. to use the word cards. The assistant state's attorney stated that during A.P.H.'s 2017 CAC interview and during interviews with the prosecutor, A.P.H. would not speak the words because she associated them with terrible things and would instead use hand signals. Accordingly, there were concrete examples of A.P.H.'s refusal to use the words. The State argued that using the cards would assist A.P.H. in her testimony and assist in defendant's cross-examination. At the beginning of her testimony, the assistant state's attorney showed A.P.H. drawings of a man and woman with different parts highlighted, and A.P.H. identified the highlighted parts with the word cards. In this manner, A.P.H. showed that the cards corresponded to the correct anatomical parts of the body. Her testimony did not consist of solely using the word cards, but rather she used them only when her testimony required her to use one of the three words. A.P.H. referred to other parts of the body out loud during her testimony, such as mouth, hand, pinky finger, face, and side, showing that she was not limiting her testimony about body parts to just the words on the cards. The trial court stated that the dangers of confusion or any other effects would be mitigated because it was a bench trial, and that the trial court would be paying attention to A.P.H.'s demeanor and manner of testifying. Given these considerations, we conclude that the trial court did not abuse its discretion in allowing A.P.H. to use the word cards.

¶ 123                                    3. Recording

¶ 124   Defendant next argues that the trial court failed to properly consider the entire recording. He maintains that the trial court listened to only the portions of the tape played by the prosecutor during Ryan's testimony and during closing argument. Defendant argues that in doing so, the trial court missed the vast majority of information on the recording that not only helped demonstrate defendant's innocence, but unequivocally showed that the trial court was wrong in stating that

defendant lied when he testified that he never played the penis game with Ryan. Defendant maintains that the trial court referred only to hearing "snippets," and that even if it did listen to the tape, it ignored the contents or misinterpreted them, as no reasonable finder of fact could listen to the hours of secret surveillance and infer anything but defendant's complete innocence.

¶ 125   The State argues that we should reject defendant's argument because the trial court was required to consider only properly admitted evidence as marshaled forward by the parties, and defendant did not play any part of the recording in court. The State maintains that because the tape contained only hearsay statements, it was the parties' obligation to establish a relevant hearsay exception. It points out that it offered the two portions of the recording for their effect on defendant rather than for the truth of the matter asserted. The State argues that the trial court was not required to, and was in fact prohibited from, considering portions of the recording not presented by the parties.

¶ 126   In a bench trial, the trial court is the trier of fact and is required to consider all of the evidence before arriving at its decision. *People v. Joiner*, 2018 IL App (1st) 150343, ¶ 69. In reviewing a conviction after a bench trial, we must presume that the trial court considered only competent evidence in reaching its verdict unless shown by affirmative evidence in the record. *People v. Moon*, 2019 IL App (1st) 161573, ¶ 36. A defendant is deprived of his right to a fair trial "where there is affirmative evidence in the record that the circuit court failed to correctly recall and consider evidence critical to fully understand and evaluate a criminal defendant's defense strategy at trial." *Joiner*, 2018 IL App (1st) 150343, ¶ 69. Whether a defendant's due process rights have been violated in this manner is a question of law that we review *de novo*. *Id.*

¶ 127   As previously mentioned, the State offered the recording into evidence without all of the limitations it now argues were present, a fact which is clearly shown by the prosecutor's statements

in closing argument. Accordingly, the trial court could consider the recording beyond the short segments played in court by the State. However, defendant has failed to cite anything in the record showing that the trial court failed to consider evidence that was critical to defendant's defense strategy at trial. See *Joiner*, 2018 IL App (1st) 150343, ¶ 69. Again, defendant sought to suppress the recording prior to trial and then did not play or cite any other portions of the recording at trial. We additionally disagree that the recording leads to the inference that defendant was innocent because, as discussed, it contains evidence that supports the charges, including defendant not unequivocally denying pulling his testicle skin over his penis when he was with Ryan, A.P.H. saying that she played the penis game with defendant, A.P.H. mentioning the marker game, and A.P.H. saying that defendant said that he could go to jail. We therefore find no error on this issue.

¶ 128                          F. Ineffective Assistance of Counsel

¶ 129    Last, defendant argues that he received ineffective assistance of counsel, separate from counsel's alleged failure to sufficiently cross-examine A.P.H., in violation of his right to due process. He argues that defense counsel failed to use numerous portions of the recording that destroyed the State's case and demonstrated his innocence. According to defendant, the tape could also have been used to impeach Ryan and highlight the inconsistencies between A.P.H., Ryan, and "reality." Defendant maintains that although counsel elicited that A.P.H. had not accused defendant of anything at the first trial, counsel breezed over A.P.H.'s prior testimony rather than emphasizing her complete turnaround for the new judge. Defendant asserts that counsel also failed to object to a greater extent to the prosecution's leading questions to A.P.H.

¶ 130    Regarding the recording, defendant argues that since the complete recording was admitted, defense counsel was free to play any portions that he chose. See also Ill. R. Evid. 106 (eff. Jan. 1, 2011) ("When a writing or recorded statement or part thereof is introduced by a party, an adverse

party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it."). Defendant maintains that the State emphasized moments of silence on the recording as indicative of his guilt, but numerous portions of the recording show that he was in complete shock and denied any wrongdoing, specifically suggesting alternative reasons for why A.P.H. may have said what she allegedly told Ryan. Defendant asserts that the recording also shows that he did not want to dismiss the matter but rather wanted to get to the bottom of it. Defendant argues that Ryan made statements on the tape that defense counsel could have used to cross-examine her but failed to, such as Ryan saying that A.P.H. did not say anything about anyone touching her; Ryan saying that one of the games involved the penis being a marker or a pen, whereas Ryan never mentions a pen at trial; and Ryan saying that she was in the bath with A.P.H., whereas Ryan testified to being outside the bathtub before testifying that she could not remember if she was in the tub. Defendant argues that defense counsel could have also rebutted the State's assertion that Ryan's and defendant's marriage was harmonious.

¶ 131   Defendant argues that perhaps because defense counsel failed to highlight the exculpatory evidence, the trial court did not consider it but instead concluded that defendant was silent at the wrong time. Defendant argues that counsel could have played the portion of the recording where defendant says that he and Ryan had never played the penis game, which would have led the trial court to realize that the evidence established defendant's innocence. Defendant further argues that counsel should have also prepared him for cross-examination by reviewing the recording with him, as defendant incorrectly admitted to being silent in response to certain statements in the car, which the State used as evidence of guilt. Defendant argues that the individual errors made by counsel require reversal, as do the cumulative effect of the errors.

¶ 132   The State argues that defendant's argument of ineffective assistance of counsel is without merit. The State maintains that the counsel confronted A.P.H. with her testimony from the first trial, and she admitted that she did not accuse defendant of having A.P.H. grab his penis with her hand or him touching her vagina, nor had she told other people this at that time. Regarding the recording, the State argues that there was a key difference in the two types of games discussed, as the second game involved the penis being a present or a piece of candy. The State asserts that the other parts of the recording that defendant argues trial counsel should have introduced contain irrelevant or trivial matters. On the subject of leading questions, the State argues that defendant has forfeited this argument by failing to cite any portion of the recording, authority, or articulating how this alleged error satisfies the *Strickland* test. The State argues that as for defendant's argument that defense counsel failed to prepare defendant for his testimony, there is nothing in the record showing that defendant did not get access to the audio recording prior to trial.

¶ 133   We conclude that defendant has failed to show that his trial counsel provided ineffective assistance. As for impeaching A.P.H. with her testimony from the first trial, defendant has failed to show deficient performance, as defense counsel elicited testimony from A.P.H. that in the first trial she did not say that she grabbed defendant's penis or he touched her vagina, and that she did not mention such incidents to others. Defendant also cannot show prejudice because the trial court was well-aware of the reasons for the second trial, and it also explicitly recognized that A.P.H. made additional allegations five years after the first allegations and three years after the first trial.

¶ 134   We agree with the State that defendant forfeited his argument that his trial counsel was ineffective for failing to object to leading questions, as defendant does not develop this argument or cite pertinent authority.  See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (argument shall contain citation to authority); *People v. Olsson*, 2014 IL App (2d) 131217, ¶ 16 (the failure to clearly define

issues and support them with authority results in forfeiture of the argument). Further, defendant cannot show prejudice, as the assistant state's attorney would have presumably rephrased his questions and elicited the same testimony had defense counsel objected.

¶ 135    Regarding the portions of the recording when A.P.H. was in the car and defendant now claims that he was wrongly described as remaining silent, in part because counsel allegedly did not adequately prepare him for cross-examination, defendant cannot show prejudice, for the trial court stated that it would not consider such silence as showing consciousness of guilt when A.P.H. was present. We further agree with the State's description of the recording on the subject of the game. As discussed, when Ryan says, "You know what I am talking about, right?", defendant responds with a monosyllabic word that sounds like "yeah," but regardless of the actual word, he does not go on to dispute what she is saying, thereby appearing to agree with her. It is only later when Ryan talks about the added element of the penis inside being like a present or a piece of candy that defendant said that they had not played "that kind of game," with Ryan agreeing. This section of the recording therefore does not satisfy either prong of the *Strickland* test.

¶ 136    That defendant was in shock during portions of the recording and that he was suggesting reasons for why A.P.H. may have said what she did would also not demonstrate deficient performance or prejudice because defendant's reaction could be interpreted as being shocked that A.P.H. had revealed what had happened, not knowing how to deal with the situation, and trying to come up with alternative explanations. Defendant did say that the issue was serious and that they could not just dismiss it, but defendant cannot show ineffective assistance as to these portions of the recording because if defense counsel emphasized these portions of the recording, the State would likely have played excerpts where defendant expressed fear that the police would not look at anyone else and would "crucify" him. The details of whether A.P.H. described the penis as a

pen or a marker, whether Ryan was inside or outside of the tub when A.P.H. was in the bath, and whether Ryan and defendant were satisfied with their marriage were minor or tangential issues that would not have affected the trial's outcome. Defendant's claim of ineffective assistance of counsel therefore fails.

¶ 137                                    III. CONCLUSION

¶ 138   For the reasons stated, we affirm the judgment of the Kendall County circuit court.

¶ 139   Affirmed.