2024 IL App (2d) 230050-U
No. 2-23-0050
Order filed May 10, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kendall County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 12-CF-299 |
| SEAN HEMPHILL, | ) ) ) | Honorable John F. McAdams, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE KENNEDY delivered the judgment of the court.
Presiding Justice McLaren and Justice Jorgensen concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court did not err in summarily dismissing defendant's postconviction petition seeking relief from his convictions of sex offenses against his daughter. First, the actual innocence claim was frivolous because it was based on evidence that was (a) not newly discovered, (b) cumulative of evidence on the issue of the victim's credibility, and (c) not likely to change the result on retrial. Second, the claim that the State withheld exculpatory evidence failed to show that the evidence in question—relating to the victim's credibility—was suppressed by the State or would likely change the result on retrial. Finally, defendant's claim that trial counsel was ineffective for failing to present certain evidence at trial was frivolous because the evidence was either inadmissible (*e.g.*, defendant's prior consistent statements) or would not likely change the result on retrial (*e.g.*, evidence relating to the victim's credibility).

¶ 2   On October 10, 2012, defendant, Sean Hemphill, was indicted on four counts of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(b), (c)(1)(i) (West 2012)). The indictment alleged that, on or about January 1, 2012, defendant committed an act of sexual conduct with his daughter, A.P.H., who was under 18 years of age, in that he had A.P.H. touch his penis for the purpose of his sexual gratification.

¶ 3   On March 19, 2014, following a jury trial, defendant was found guilty of all counts. Defendant filed a motion for a judgment notwithstanding the verdict or a new trial. The trial court granted defendant's motion and ordered a new trial. Defendant then filed a motion to dismiss the indictment based on double jeopardy, which the court denied. Defendant appealed, and we affirmed. See *People v. Hemphill*, 2016 IL App (2d) 151196-U, ¶ 2 (*Hemphill I*).

¶ 4   On July 31, 2017, before the second trial began, the State charged defendant with an additional four counts of aggravated criminal sexual abuse (for a total of eight counts) and six counts of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2012)).

¶ 5   On November 7, 2018, following a bench trial, the trial court found defendant guilty of all charges. The trial court sentenced defendant to an aggregate term of 45 years in prison. Defendant appealed, and we affirmed. See *People v. Hemphill*, 2021 IL (App) 2d 190473-U, ¶ 2 (*Hemphill II*).

¶ 6   On October 24, 2022, defendant filed a petition under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2020)), seeking relief from those convictions. The trial court summarily dismissed the petition, and defendant now appeals. We affirm.

¶ 7                                    I. BACKGROUND[1]

¶ 8                              A. First Trial and Appeal

¶ 9      On March 6, 2013, before defendant's first trial, the State gave notice under section 115-10 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10 (West 2012)) of its intent to introduce out-of-court statements made by A.P.H. The trial court ruled that the State could introduce certain statements that A.P.H. made to (1) her mother, Ryan Hemphill (Ryan), (2) an interviewer during A.P.H.'s Victim Sensitive Interview (VSI) at the Children's Advocacy Center, and (3) personnel at Long Beach Elementary School.

¶ 10     Defendant's first jury trial began on March 17, 2014. A.P.H. testified that she was born on January 4, 2004, and was currently 10 years old. In 2012, she lived with both parents in a three-bedroom house. She was afraid to sleep in her own bed because she once saw an ant crawling on it. She slept instead with one of her parents, who slept in separate bedrooms. One day, she heard from some other children that if a boy kissed a girl, the girl would get pregnant. That did not make sense to A.P.H. because her parents frequently kissed, yet her mother did not become pregnant. On January 5, 2012, she was going to sleep in defendant's bed and asked him about what she had heard. Defendant told her what it meant to be pregnant, and he talked about girls' and boys' "body parts."

¶ 11     The assistant state's attorney asked A.P.H., "Did you ask him to do something?" A.P.H. replied, "No." She stated that defendant told her not to tell anyone, but she told Ryan and "Mr.

---

[1]As noted, this is defendant's third appeal related to this case. The facts as stated are derived in relevant part primarily from *Hemphill I* and *Hemphill II* with additional facts added as needed to address the issues presented in this case.

Lipke." When asked, "The thing that you told your mom and the other people, did that really happen?", A.P.H. replied in the affirmative. A.P.H. was asked if she wanted "to tell these people what happened to you in bed with" defendant, and she stated, "He just told me what it meant." The assistant state's attorney again asked, "Now, when he told you what it meant, did you ask him to do anything else?" A.P.H. replied, "No."

¶ 12    On cross-examination, defense counsel asked if there were times when A.P.H. heard her parents argue or yell. A.P.H. replied, "Not yell, but they argued about a few things." Counsel asked A.P.H. what she did when her parents argued, and she replied, "I don't really know. Probably ignore it or go down there and like try to get them into a conversation." A.P.H. was not worried about her parents divorcing. She stated, "My mom always thought that she would never get a divorce because she was happy with what she had."

¶ 13    Next, three officers collectively testified that they were dispatched to A.P.H.'s home on the evening of January 5, 2012. They observed A.P.H. alternating between excitement because she had just had a birthday and being upset and crying. Ryan provided a written statement, and defendant left the house voluntarily.

¶ 14    When the trial resumed the next day, defendant orally objected to A.P.H.'s out-of-court statements being admitted into evidence. Defendant argued that A.P.H. did not testify as to any criminal conduct by him, so the hearsay statements were inadmissible. The trial court denied the motion.

¶ 15    Erin Buddy testified that, on January 30, 2012, she was substitute teaching at Long Beach Elementary School, as she had been doing every Wednesday. On that day, she worked with three second-grade students, including A.P.H., on literacy skills. A.P.H. looked unusually tired, and Buddy asked if she was all right. A.P.H. said that she did not sleep well the previous night, and

Buddy asked if she was out doing something fun. A.P.H. replied that she was not sleeping well because—as Buddy understood it—A.P.H.'s father was either asking her to come into his bed or asking if he could join her in her bed. Buddy reported the conversation to the school social worker and Assistant Principal Dawn Marmo. For the rest of the academic year, whenever Buddy asked A.P.H. how she was doing, A.P.H. would say that she was fine.

¶ 16    Marmo testified as follows. On January 30, 2012, A.P.H. visited Marmo's office and told her that she was upset and sad because her parents were divorcing and she really wanted a brother or sister. A.P.H. said that when she and Ryan were bathing together, she talked to Ryan about her father. A.P.H. told Marmo that the divorce was her fault because she had asked defendant about sex and about boys' and girls' "parts," and that he had shown her "his parts." Marmo asked the principal, Mr. Lipke, to come into the room, and A.P.H. repeated the statement. Marmo contacted the Department of Children and Family Services. Later that day, A.P.H. approached Marmo on the playground during recess. A.P.H. asked if Marmo was married, had children, and knew what it meant to be "hard." Marmo responded in the affirmative, and A.P.H. said that defendant had shown her what being "hard" meant. A.P.H. then said that there was "a lot more" but that she did not want to talk about anything else. A.P.H. said Marmo could tell Mr. Lipke about their conversation but not her mother.

¶ 17    Ryan testified that she married defendant in 2003 and that A.P.H. was their daughter. In January 2012, she worked from home. The household's atmosphere was "mostly pretty good," though "[f]rom time to time" she and defendant did not get along. Ryan loved defendant and believed that he loved her.

¶ 18    A.P.H.'s room had a twin-size bed, and the master bedroom and guest room each had queen-size beds. Ryan would get up around 4:30 or 5 a.m. to start work so that she could spend

more time with her family later in the day. Ryan would sleep in the guest room three or four nights per week because defendant was a light sleeper and Ryan's alarm would wake him up. Ryan snored, which also interfered with defendant's sleep. A.P.H. did not like to sleep in her bed because one night she saw an ant in her bed, and she was convinced that an ant would be in her bed every time she slept there. A.P.H. began sleeping in whatever room Ryan was in. However, a few months before January 2012, defendant said that A.P.H. should be able to choose wherever she slept, with the thought that, eventually, she would choose her own bed.

¶ 19     On January 4, 2012, Ryan and A.P.H. planned to meet defendant for A.P.H.'s birthday dinner. Ryan was helping A.P.H. wash her hair, and A.P.H. said she knew the difference between girls' and boys' parts. Ryan replied that she knew that A.P.H. had seen her male baby cousin's diaper changes. A.P.H. then said that she had seen and touched defendant's private parts. Ryan asked if she had seen him after a shower or as he dressed. A.P.H. said no and that she had asked defendant if she could see his private parts. He let her see them. A.P.H. said there was a part with soft skin and hair on it, with two "balls" inside. A.P.H. asked what the balls were called, and Ryan said, "[T]esticles." A.P.H. replied, "[Y]eah." During this time, A.P.H. seemed normal and happy. A.P.H. said that there was another part that stuck out in the front, with a hole in it where the pee came out. She asked if that was called the "penis," and Ryan responded affirmatively.  Ryan had used those words with A.P.H. once or twice when talking about A.P.H.'s baby cousin. At this point, Ryan was "alarmed because what [A.P.H.] had described to [her] was obviously an adult['s] genitals, not a child['s]."

¶ 20     Ryan asked A.P.H. what defendant had shown her, and A.P.H. said that she and defendant had played a game where they took the testicles' skin and stretched it over the penis to cover it up. A.P.H. would then "take it off and it would be a present or surprise." Sometimes, they pretended

"it" was a piece of candy. A.P.H. described another game where they would "pretend that the penis was a marker and that if you squeezed one of the balls, blue ink would come out. If you squeeze[d] the other [ball], green ink would come out."

¶ 21    A.P.H. noticed that Ryan had gone quiet, and A.P.H.'s face "dropped." A.P.H. said that Ryan must not tell defendant or anyone else what A.P.H. had said because, otherwise, defendant could go to jail. Ryan said she would not make such a promise because "we don't keep secrets in our family." Ryan asked where and when this had happened. A.P.H. said that she and defendant played the game in the master bedroom before bed. A.P.H. could not provide a date, and when Ryan asked if it happened before or after Christmas, A.P.H. said it occurred after Christmas. Ryan said that she was glad A.P.H. had told her. They went out to dinner, but Ryan did not confront defendant at that time because she did not want to ruin A.P.H.'s birthday and did not want to talk to him in front of her. Ryan insisted that A.P.H. sleep with her that night.

¶ 22    The next evening, January 5, 2012, Ryan talked to defendant while A.P.H. was at her tae kwon do class. Ryan repeated what A.P.H. had said, and defendant was very quiet. He asked what she was talking about and why A.P.H. would say those types of things. They picked up A.P.H., and when they were pulling out of the parking lot, A.P.H. must have seen that defendant was upset. She blurted out, "[S]ee, I told you if I told everything that dad could get in trouble." Ryan asked A.P.H. to repeat what A.P.H. had told her, and A.P.H. did so. Defendant asked why she was saying this and who had done this. A.P.H. leaned forward and said, "[Y]ou and me." They went to eat at Wendy's. A.P.H. said that she should not have told Ryan, because defendant was upset and he could go to jail. She asked why Ryan could not keep a secret.

¶ 23    They returned home, and Ryan told defendant they should talk to A.P.H. one more time. A.P.H. began to repeat the same things, and defendant told her to tell the truth. Defendant asked

why she was saying such things, and she replied, "[B]ecause you did." When defendant again asked why she was saying such things, A.P.H. got a "crushed" look on her face. After these disclosures, Ryan filed for divorce, and the divorce was now final.

¶ 24    Michelle Hawley testified that she was the mental health assistant director of the Kendall County Health Department. As part of her job, she worked at the Children's Advocacy Center, interviewing children who were possible victims of physical or sexual abuse. She would meet with the parent before the interview to obtain the parent's consent and learn about the situation, and she would also review police reports. On January 11, 2012, she conducted the VSI with A.P.H.; the interview was video recorded. During the interview, Hawley had A.P.H. identify male and female anatomy on charts; the charts were admitted into evidence.

¶ 25    The interview recording was played for the jury, which was also given transcripts. We summarize the interview. A.P.H. reported that she told Ryan that she asked defendant what sex was and if she could see what his private parts looked like. A.P.H. had thought sex was when a couple kissed and laid in bed together. Defendant told her the "right thing"—that sex was when a boy puts his penis in "her" private parts and then "yucky stuff comes out." This conversation occurred three days before A.P.H.'s birthday, when they were in his bed. Defendant let A.P.H. see his private parts; defendant had his sleep shorts on and took his penis out through the hole in the shorts. A.P.H. asked if she could touch it, and he said, "Yes." This happened only once.

¶ 26    Hawley asked A.P.H. about the "game" that she told Ryan she had played with defendant. At this point in the interview, A.P.H. said that she wished that she had never told her mother "[b]ecause none of this would have ever happened. It could keep it the same." She explained further, "It would be the same. Nothing would have happened. My dad wouldn't leave and my mom wouldn't call the cops."

¶ 27 A.P.H. then explained the "game." She said that, on the same night he showed her his penis, she and defendant played a game twice about changing the color of "pencils." A.P.H. thought up the game because the penis was shaped like a "marker." A.P.H. touched the side of the penis and held it with her hand for one second each time. Defendant then said what "it [was]," which was "a marker." Then A.P.H. let it go, and they went to bed. The penis was soft, and nothing came out of it. Defendant told A.P.H. not to tell Ryan because he could go to jail for it.

¶ 28 Previously, A.P.H. had not seen defendant's penis. She often felt it on her leg while sleeping with him; it would come out when defendant moved around. At these times, Ryan was working or sleeping in the guest room. A.P.H. never saw defendant's penis during those times because the room was dark, and she would just move away. A.P.H. told defendant once about his penis touching her leg, and he said that he was sorry. At times, A.P.H. wore only underwear to bed. Sometimes, defendant accidentally touched her thighs or the top of her underwear, and then he would move over. Defendant's hand never went inside her underwear.

¶ 29 A.P.H. told Ryan about the game and told her not to tell defendant, but Ryan did anyway. A.P.H. did not think that it was good that she told Ryan, because "[n]one of this would have happened" otherwise; defendant "would still be here," and "[n]o one would be mad."

¶ 30 The State rested, and defendant moved for a directed verdict, primarily because A.P.H. did not testify in court as to any wrongful or unlawful conduct by defendant. The trial court denied the motion. On March 19, 2014, the jury found defendant guilty of all four counts of aggravated criminal sexual abuse.

¶ 31 On April 17, 2014, defendant filed a motion for a judgment notwithstanding the verdict or a new trial. Defendant argued, among other things, that the trial court erred in allowing into evidence A.P.H.'s hearsay statements to Marmo, Ryan, and Hawley, because A.P.H. failed to

testify at trial as to any wrongful or unlawful conduct by defendant. Defendant argued that the court similarly erred in allowing into evidence the recording and transcript of A.P.H.'s interview with Hawley.

¶ 32　On June 18, 2014, the trial court granted defendant's request for a new trial. It stated that, because A.P.H. did not testify that defendant engaged in any of the actions forming a basis for the charges against him, the admission of hearsay evidence under section 115-10 of the Code was error.

¶ 33　Defendant then filed a motion arguing that a second trial would violate his constitutional right against double jeopardy. The court denied the motion on September 4, 2014. The case was called for a retrial over one year later, on December 2, 2015. The same day, defendant filed a motion to dismiss based on double jeopardy, reasserting his prior arguments. The trial court denied the motion, and defendant appealed. We affirmed, holding that double jeopardy did not prohibit a retrial here even if the evidence at the first trial was insufficient. See *Hemphill*, 2016 IL App (2d) 151196-U, ¶¶ 36-37.

¶ 34　　　　　　　　　　　B. Second Trial and Appeal

¶ 35　　　　　　　　　　　1. The January 5, 2012, Recording

¶ 36　In March 2016, the State tendered to defendant a recording that Ryan had secretly made on January 5, 2012. The police obtained the recording from Ryan on December 2, 2015. The recording was many hours long and covered her discussion with defendant during A.P.H.'s tae kwon do class, their conversation with A.P.H. and her accusations against defendant, and the interaction with the police officers who arrived at the home.

¶ 37    On February 24, 2017, defendant filed a (1) "Motion to Suppress [the January 5, 2012,] Recording" (motion to suppress) and (2) "Motion to Dismiss—Motion for Sanctions—Withholding of Material Evidence" (motion to dismiss).

¶ 38    The motion to suppress argued that the January 5, 2012, recording was inadmissible. The motion also included the following allegations concerning other recordings:

> "7. On January 13, 2012, a Court Order was entered authorizing the use of an eavesdropping device for a period between January 13, 2012 at [*sic*] February 12, 2012.
>
> 8. That the State did not tender any discovery from any evidence elicited as it related to the eavesdropping device and overhear during the period of January 13, 2012 through February 12, 2012."

¶ 39    The motion to dismiss argued that, due to the failure to disclose the January 5, 2012, recording, the charges against defendant should be dismissed or Ryan should be barred from testifying in the second trial. That motion also included the above allegations concerning other recordings.

¶ 40    The State's combined response to the motions did not address the allegations concerning any recordings made between January 13, 2012, and February 12, 2012.

¶ 41    At a May 5, 2017 hearing, the State asserted that it did not learn of the January 5, 2012, recording until one of its meetings with Ryan after the trial court had granted a continuance of the second trial. The State then immediately obtained a copy and thereafter provided it to defendant. The State represented that it did not anticipate using the recording at the second trial. Defense counsel stated that he would have proceeded differently in the first trial, including in his cross-examination of Ryan, had he known of the recording. Defendant did not make any argument as to the eavesdropping order or recordings made pursuant to that order.

¶ 42 On May 10, 2017, the trial court denied defendant's motions. It found no evidence that the State knew of the January 5, 2012, recording before the first trial, even though the State used due diligence to ensure that it would be aware of such evidence. It also found that the State promptly notified defendant after learning of the recording. The court further stated that even if the State had violated discovery rules, the proper remedy would not be dismissal of the charges but, rather, to provide defendant with more time to prepare for trial. The court noted that, because defendant had the recording in his possession since March 20, 2016, he had ample time to prepare for trial.

¶ 43                                   2. Section 115-10 Motion

¶ 44 Also on February 24, 2017, defendant filed a motion seeking to bar readmission of the section 115-10 statements introduced at the first trial. Defendant noted that he was receiving a new trial because the trial court ruled that these statements should not have been admitted in the first trial as A.P.H.'s testimony failed to accuse him of wrongdoing. The trial court denied the motion on May 10, 2017. It stated that a court may make a reliability determination under section 115-10 without the child's testimony and that A.P.H.'s failure to testify as to any specific acts was based on the State's line of questioning, as opposed to her testifying that nothing happened with her and defendant in bed.

¶ 45                                   3. Additional Charges

¶ 46 On July 31, 2017, the State charged defendant with four additional counts of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(b), (c)(1)(i) (West 2012)) and six counts of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2012)). In the amended indictment, counts I through IV were the original charges of aggravated criminal sexual abuse. Counts V through X charged defendant with predatory criminal sexual assault of a child. Counts V, VI, and VII alleged that defendant, who was over 17, committed an act of sexual penetration in

that he put his penis in the mouth of A.P.H., who was under 13. Counts VIII through X alleged that defendant put his penis on A.P.H.'s vagina.[2] Counts XI through XIV were the four new charges of aggravated criminal sexual abuse and alleged that defendant, for his sexual gratification, put his penis on A.P.H.'s arm (counts XI and XIII) and on her face (counts XII and XIV).

¶ 47                              4. Word Cards

¶ 48     On November 2, 2018, before defendant's second trial (a bench trial), the State filed a motion asking that A.P.H. be allowed to testify with "visual aids," specifically to use cards with the words "penis," "testicles," and "vagina" instead of saying these words. The trial court addressed the motion on November 5, 2018, before the parties' opening statements. The State stated that during A.P.H.'s 2017 interview at the Children's Advocacy Center (CAC interview), as well as in interviews with the prosecutor, A.P.H. did not speak the aforementioned words because she associated them with "terrible things." The State asserted that it had 11 clips of the 2017 CAC interview where A.P.H. refused to use the words and resorted to using hand signals. The State argued that the words were important to the case and that using the cards would facilitate A.P.H.'s testimony and actually enhance defendant's ability to cross-examine her because, without the cards, A.P.H. might remain mute when asked questions about sexual activity. Defense counsel objected, stating that A.P.H. was 14 years old and had no disability. He argued that A.P.H. could instead use slang terms or her own words and that using the word cards would undermine the ability to assess A.P.H.'s demeanor and credibility.

¶ 49     The trial court ruled that the word cards were demonstrative evidence that would assist the court, as the trier of fact, in understanding A.P.H.'s testimony. The court found that the dangers of confusion or any other negative effects would be mitigated because defendant was having a bench

---

[2]The State dismissed counts IX and X before trial.

trial and the court would be paying attention to A.P.H.'s demeanor and the manner in which she testified.

¶ 50                                    5. Testimony

¶ 51    A.P.H. testified that she was 14 years old and a freshman in high school. She lived with Ryan and her stepfather in Plainfield. In the days leading up to her eighth birthday, she lived in Montgomery with Ryan and defendant. A.P.H. had seen an ant on the top of her bottom bunk bed, so she did not want to sleep in her bed anymore. A.P.H., therefore, began sleeping alternately with Ryan, who slept in the spare room, and defendant, who slept in the master bedroom. Around that time, A.P.H. had heard from other kids at school that kissing caused pregnancy. That did not seem right to her because her parents kissed, yet she did not have a sibling.

¶ 52    The assistant state's attorney asked if A.P.H. knew the difference between a man's and a woman's private parts. She answered in the affirmative. He asked if she was comfortable "saying [those words] out loud," and she replied no. He asked if she would be more comfortable using the word cards, and she said yes. The assistant state's attorney showed her drawings of a man and a woman with different parts highlighted, and A.P.H. identified the highlighted parts with the word cards.

¶ 53    A.P.H. then continued with her testimony. Shortly before her eighth birthday, she was with defendant in his home office. On the monitor, she saw a woman's mouth on a man's "penis."[3] She

---

[3]A.P.H. used the word cards with "penis," "testicles," and "vagina" throughout her testimony instead of saying the words. We use quotation marks to indicate when she used a word card. Where these words do not have quotation marks, A.P.H. was responding to the assistant state's attorney's questions that used those words.

might have seen something like that previously in a movie. Defendant turned off the monitor. The image confused A.P.H. and made her curious.

¶ 54     One night shortly thereafter, while getting in bed with defendant, she asked him if kissing made a woman pregnant. He said no, and she asked how babies were created. Defendant explained the process to her, "[l]ike in health class." Defendant was wearing boxers, and he showed her his "penis" through the opening in the boxers. It was the first time A.P.H. had seen an adult male penis. He then played a game where he put his "testicles" around his "penis," and the penis was supposed to be a "present." When defendant did that, his penis was soft. At some point in the nights leading up to A.P.H.'s eighth birthday, A.P.H. put her hand on defendant's penis, which was hard. She did not keep her hand still but, rather, "[m]oved it" at defendant's request. She put her hand on defendant's penis on more than two other nights.

¶ 55     Also, on a night leading up to her eighth birthday, defendant put his pinky finger in her mouth before putting his "penis" in her mouth. His penis was hard. The first time, A.P.H. told defendant that "[i]t tastes bad." Defendant said that "[t]here was something that could help," but they could not use it because Ryan "would smell it." Defendant put his penis in her mouth on more than two different nights leading up to her eighth birthday.

¶ 56     On another night around the same time, defendant put his penis in her "vagina." A.P.H. was awake and sitting on the bed when this happened. Defendant's penis was hard, and he asked her if it felt good. She said no. This occurred one time.

¶ 57     There were also times when A.P.H. was sleeping with defendant and she woke up in the middle of the night while defendant was touching her with his "penis." He did this on the side of her body and face, each more than once.

¶ 58    The last time defendant put his penis in A.P.H.'s mouth, he was standing at the end of the bed, and he asked her to get a towel so the sheet would not get dirty. He put the towel on the end of the bed and touched his "penis." A.P.H. saw something come out and go on the towel. Defendant told her not to tell Ryan, but A.P.H. did not remember if he said why. A.P.H. did not sleep with defendant that night but, rather, went into the bathroom, where Ryan was, and talked to her.

¶ 59    On cross-examination, A.P.H. did not remember where the family went for her birthday or what she did after school that day. Around that time, she and Ryan would bathe together on occasion, with Ryan facing her in the tub. Ryan did not talk to A.P.H. about body parts at these times. However, A.P.H. watched many scary movies, and Ryan would explain what was happening if there was a "make-out scene." A.P.H. remembered testifying at a prior trial, and she agreed that she did not previously testify that she touched defendant's penis with her hand or that he touched her vagina. Aside from the trial, A.P.H. had talked to other people about defendant's conduct, and she did not tell them these things, either.

¶ 60    A.P.H. testified that she met with "Mu"[4] in July 2017, before the current trial, and they recapped her previous testimony. Mu said that A.P.H. "need[ed] to talk more, like not freeze up," which was what had happened in the first trial. A.P.H. made additional allegations against defendant after meeting with Mu, but those came from "information [A.P.H. was] holding in for several years." Before 2017, she had not thought about the other incidents. Defense counsel asked A.P.H. if, before she made her additional allegations, "there [was] an occasion" when she visited porn sites. She said yes. Counsel asked what kind of porn sites A.P.H. had been visited, and the State objected. The trial court overruled the objection but stated that counsel was "not going to

_____

[4]The parties stipulated that "Mu" was Assistant State's Attorney Nemura Pencyla.

have a long leash on this." A.P.H. answered, "I don't know," when asked what kind of porn sites she had visited and whether the sites had men and women. A.P.H. also did not know if Ryan had said that adult male testicles were like two balls with hair around them.

¶ 61    Ryan provided testimony consistent with her testimony in the first trial regarding the family's sleeping arrangements and A.P.H.'s statements to her while taking a bath. She again testified that, before January 4, 2012, she and defendant got along "pretty well." She stated, "I think like most marriages, we had little fights here and there, but in general, pretty well." When asked if they ever had "any fights," she responded, "Of course." When asked what the fights were about, she stated: "I mean, most were smaller things like about, you know, him not helping with housework or playing video games a lot was a sticky point."

¶ 62    Ryan also testified as follows. She was familiar with A.P.H.'s description of defendant's pulling his testicle skin over his penis, because defendant had done that in front of Ryan numerous times after having sex. A.P.H. told Ryan that she and defendant had played that "game," as well as the "game" where they pretended that defendant's penis was a marker, many times.

¶ 63    Ryan planned to confront defendant the next day—January 5, 2012—during A.P.H.'s tae kwon do class. In preparation, she cued up an e-mail that would automatically be sent to her mother the next morning saying that if she received the e-mail, Ryan had confronted defendant and something bad had happened. Ryan also hid a small voice recorder in her bra. It recorded everything that was said that evening until Ryan went to bed. The State played excerpts in which Ryan, defendant, and A.P.H. conversed. In the first excerpt, Ryan described to defendant the "game" with his testicle skin and said that he had also done that with Ryan. Defendant began breathing hard and crying. In the other excerpt, Ryan had A.P.H. explain to defendant what she

told Ryan in the bathtub about the "games." Defendant asked A.P.H. who she did this with, and she said, "[Y]ou and me." Defendant then began to cry.

¶ 64    When Ryan mentioned calling the police, defendant said that the police "[would not] even look at anyone else" and would "crucify" him. Ryan contacted the police later that night, and they just took some information and said that someone would contact her to set up an interview for A.P.H. Defendant was not taken into police custody, but "the decision was that he would leave the house for the night." He came back to the house only once after that, to get his things. Ryan filed for divorce in February 2012.

¶ 65    When Ryan and defendant were married, they used two sexual aids that had aromas. One was a minty menthol gel for oral sex, and the other was a fruity one that would get hot when blown on. They were kept in a box on a deep shelf in their closet, and to the best of Ryan's knowledge, A.P.H. had never seen them.

¶ 66    A.P.H. currently had a cell phone, and Ryan made it clear to her that Ryan would have access to the phone's search history. Before July 22, 2017, Ryan and A.P.H. had discussed the upcoming trial with the State's Attorney's office. Sometime earlier in the week of July 22, 2017, Ryan noticed from the Google search history on A.P.H.'s phone that "there were some pornography sites." When asked if she remembered the names of the websites, she replied, "I think it was just one. I think it was [Pornhub]." She testified: "I mean, there were several different videos it looked like. I mean, I don't know the exact videos. I didn't look at them." A.P.H. was not home at the time. Ryan later addressed the situation with A.P.H., which resolved it "[f]or the most part." A.P.H. told Ryan that she would not look at porn sites again. On July 22, 2017, Ryan learned new information from A.P.H. about her contact with defendant. Ryan shared this information with the State's Attorney's office.

¶ 67    At the first trial, Ryan did not mention the January 5, 2012, audio recording because no one asked her about it. She believed she told a detective about the recording when she gave her original statement. She recalled being told that the recording was "not something [they] could use anyway." Ryan did not think that the subject came up in the draft e-mail to her mother, which she never sent.

¶ 68    Buddy, Marmo, and Hawley testified consistently with their testimony at the first trial. Buddy additionally testified that A.P.H. was identified as needing educational support. Hawley testified that during her 2012 interview with A.P.H., A.P.H. used the word "penis" several times.

¶ 69    Defendant moved for a directed finding, and the trial court denied the motion. Defendant then testified as follows. Between December 1, 2011, and January 4, 2012, A.P.H. never asked how a pregnancy occurred, nor did defendant have any sexual contact with A.P.H. or show her his penis. Defendant denied that he and Ryan used sexual aids together; rather, she had aids for herself. He had never pulled the skin surrounding his testicles over his penis. On January 4 or 5, 2012, there was no divorce pending between him and Ryan, but they talked about it frequently. Defendant wanted to divorce Ryan because, in the summer of 2011, he caught her showing her breasts online to a man, and she would not discuss it. Afterward, they were like roommates, except when dealing with A.P.H. They argued "constantly" and in A.P.H.'s presence.

¶ 70    Defendant left the house on January 5, 2012, because one of the officers said it would be best if defendant did. Defendant also believed that he needed to let law enforcement do their job, and he did not want them to say that he had tainted the investigation in any way. Defendant admitted that (1) he did not say anything on the January 5, 2012, recording after Ryan asked if he was going to tell her that A.P.H. was lying; (2) he did not say, "I didn't do that," when A.P.H. mentioned balls or defendant's pulling his skin over his penis; and (3) he did not say anything

when A.P.H. said, "[M]e and you." Defendant explained that he was silent when the allegations were made because he was terrified that people would believe the allegations and that he would end up dead or killed in prison.

¶ 71 Defendant's sister testified that she stayed with the family for three days in October 2011. She testified, "[Defendant and Ryan] were separated the time I was there. I would just spend time with [A.P.H.] and [defendant] together, and then with Ryan and [A.P.H.] together. I didn't really spend time together with them all. It was kind of tense there." She did not know if the failure to interact "was some sort of long-term problem or just some short spat." She has "observed [defendant and Ryan] fight on multiple occasions."

¶ 72                                 6. Trial Court's Ruling

¶ 73 The trial court issued its ruling on November 7, 2018, stating as follows. It considered several factors in weighing A.P.H.'s and defendant's credibility. It considered their demeanor, physical appearance, the manner in which they testified, and the substance of their testimony. It recognized that A.P.H. did not make any additional allegations until July 2017, five years after her initial allegations and three years after the first trial. The court considered A.P.H.'s demeanor during the VSI and her statements that she regretted telling Ryan because of how it affected the family. The court noted that, although A.P.H. used word cards instead of saying the words, it observed her physical movements and mannerisms while using the cards. It considered Ryan's recording for the sole purpose of its effect on defendant. The court gave no weight to the excerpts of the recording where defendant did not respond when A.P.H. was in the car, because the court was unwilling to label his silence as consciousness of guilt in that circumstance. It did give some weight to defendant's silence when Ryan and defendant were alone. The court specifically mentioned defendant's silence after Ryan said that A.P.H. had described defendant's pulling his

testicles over his penis and that Ryan knew what A.P.H. was talking about because defendant had jokingly done the same with his penis when he and Ryan were in bed together after having sex. The court found that defendant's silence was contrary to his testimony that he had never manipulated his genitals in that manner.

¶ 74    The trial court concluded, from the totality of the circumstances, that A.P.H.'s claims were credible. The court found defendant guilty of all 12 charges.

¶ 75    On March 18, 2019, the trial court denied defendant's amended posttrial motion. On May 1, 2019, the court sentenced defendant to an aggregate term of 45 years in prison. The court merged the eight aggravated-criminal-sexual-abuse counts (I through IV and XI through XIV) into three counts (IV, XI, and XII) and imposed concurrent five-year terms on those counts. It sentenced defendant to 10 years' imprisonment on each of the four predatory-criminal-sexual-assault-of-a-child counts (counts V through VIII) running consecutively to each other and the 5-year terms on counts IV, XI, and XII. On June 3, 2019, the court denied defendant's motion to reconsider his sentence. Defendant timely appealed.

¶ 76    On appeal, defendant argued that (1) the State violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to timely disclose Ryan's January 5, 2012, recording; (2) the trial court erred in admitting hearsay statements under section 115-10 of the Code; (3) the evidence was insufficient to prove defendant guilty beyond a reasonable doubt; (4) the trial court erred in limiting cross-examination regarding A.P.H.'s viewing of pornography; (5) the trial court erred in allowing A.P.H. to testify using word cards; (6) the trial court erred in failing to consider the entire recording made by Ryan; and (7) trial counsel was ineffective for, among other things, failing to use numerous portions of the record that "destroyed the State's case and demonstrated his innocence." *Hemphill*, 2021 IL App (2d) 190473-U, ¶ 129. We affirmed. *Id.* ¶ 138.

¶ 77   On October 24, 2022, defendant petitioned for postconviction relief. The trial court summarily dismissed the petition as frivolous and patently without merit. This timely appeal followed.

¶ 78                                II. ANALYSIS

¶ 79   Defendant contends that the trial court erred in summarily dismissing his postconviction petition because he presented colorable claims of (1) actual innocence, (2) a violation of his rights under *Brady*, and (3) ineffective assistance of trial counsel. In support of his actual innocence claim, defendant contends that "[n]ew evidence was presented that demonstrated among other things: APH had a motive to lie, [defendant's] and Ryan's marriage had fallen apart[,] and there was no justification for APH's use of the [word] cards." In support of his *Brady* claim, defendant contends that "the pornography APH admitted to watching before she made her new allegations in 2017 was not produced to the defense." In support of his ineffectiveness claim, defendant contends that trial counsel was ineffective in that he "did not confront APH with readily available evidence, such as the fact that she regularly used sexual terms and was not offended by them," and "failed to use readily available evidence to show that Ryan's and [defendant's] marriage was irreversibly destroyed."

¶ 80   The Act creates a statutory remedy for criminal defendants who claim that substantial violations of their constitutional rights occurred at trial. *People v. Edwards*, 2012 IL 111711, ¶ 21. Under the Act, the trial court independently reviews the postconviction petition within 90 days of its filing to determine if it "is frivolous or is patently without merit" (725 ILCS 5/122-2.1(a)(2) (West 2020)), in which case the petition shall be summarily dismissed. *People v. Edwards*, 197 Ill. 2d 239, 244 (2001). "A petition may be summarily dismissed as frivolous or patently without merit only if the petition has no arguable basis either in law or in fact." *People v. Tate*, 2012 IL

112214, ¶ 9; *People v. Hodges*, 234 Ill. 2d 1, 16 (2009). "A petition which lacks an arguable basis either in law or in fact is one which is based on an indisputably meritless legal theory or a fanciful factual allegation." *Hodges*, 234 Ill. 2d at 16. An example of an indisputably meritless legal theory is one that is "completely contradicted by the record," while fanciful factual allegations include those that are "fantastic or delusional." *Id.* at 16-17.

¶ 81     It is well established that " 'frivolous or patently without merit' encompasses the common-law doctrines of *res judicata* and forfeiture." (Internal quotation marks omitted.) *People v. Munz*, 2021 IL App (2d) 180873, ¶ 28. "*Res judicata* bars the consideration of issues that were previously raised and decided on direct appeal, whereas forfeiture bars any claims that could have been raised on direct appeal but were not." *Id.*

¶ 82     The summary dismissal of a postconviction petition is subject to *de novo* review. *People v. Hatter*, 2021 IL 125981, ¶ 24.

¶ 83                                   A. Actual Innocence Claim

¶ 84     We first consider whether defendant's petition presents an arguable claim of actual innocence.

¶ 85     A claim of actual innocence requires evidence that is "(1) newly discovered, (2) material and not cumulative, and (3) of such conclusive character that it would probably change the result on retrial." *People v. Robinson*, 2020 IL 123849, ¶ 47. "Newly discovered evidence is evidence that was discovered after trial and that the [defendant] could not have discovered earlier through the exercise of due diligence." *Id.* "Material" means that the evidence is "relevant and probative of the [defendant's] innocence." *Id.* "Noncumulative" means that the evidence "adds to the information that the fact finder heard at trial." *Id.* The "conclusive character" requirement is "the most important element of an actual innocence claim"; it means that the new evidence, "when

considered along with the trial evidence, would probably lead to a different result." *Id.* In other words, "[t]he new evidence need not be entirely dispositive," but it must "place[ ] the trial evidence in a different light and undermine[ ] the court's confidence in the judgment of guilt." *Id.* ¶ 48.

¶ 86    Defendant relies on the following "new evidence" in support of his actual innocence claim: (1) an affidavit by Kyler Hosanna, which according to defendant, impeaches Ryan's testimony concerning the discovery of pornography on A.P.H.'s cell phone and provides evidence that A.P.H. fabricated the allegations in counts V through XIV, which were added on July 31, 2017, before the second trial began, and (2) evidence found on A.P.H.'s phone that, according to defendant, shows that (a) Ryan lied about the status of her and defendant's marriage and (b) A.P.H. was not uncomfortable using sexual language. Defendant contends that "[w]hen one considers the totality of the evidence now known, one must conclude that there is a reasonable likelihood that if that evidence is submitted to a new trier of fact, the outcome of the trial will be different." We address each piece of "new evidence" in turn.

¶ 87                                    1. Hosanna's Affidavit

¶ 88    In the affidavit, Hosanna averred that he was married to Ryan before defendant's second trial and lived with Ryan and A.P.H. Hosanna was present when Ryan saw A.P.H.'s cell phone and discovered that A.P.H. was viewing videos on "Pornhub," a pornography website. Hosanna averred: "When Ryan discovered that, Ryan was very angry. She confronted [A.P.H.] [A.P.H.] ran to the bathroom and shut the door." According to Hosanna: "There was a lot of yelling. Ryan told [A.P.H.] she was in big trouble." Hosanna further averred: "Only then did [A.P.H.] make the allegations against [defendant] after Ryan made it clear that [A.P.H.] was in trouble and subject to discipline for reviewing the pornographic videos."

¶ 89    Defendant claims that Hosanna's affidavit provides "new evidence" that A.P.H. fabricated the allegations in counts V through XIV. According to defendant, the affidavit impeaches Ryan's testimony that she "calmly address[ed] the situation" with A.P.H. and shows, instead, that Ryan "became enraged." Defendant argues that this evidence thus establishes a motive for A.P.H. to fabricate the new allegations, *i.e.*, to "garnish[ ] [*sic*] sympathy" and "deflect blame for her actions [of viewing pornography]." Defendant also argues that the affidavit "provide[s] new evidence of the source of A.P.H.'s sexual knowledge"—the pornography. We disagree.

¶ 90    First, even if the affidavit can be deemed newly discovered evidence, it is cumulative to evidence presented at trial. Both A.P.H. and Ryan testified that A.P.H. had visited several pornographic websites on her cell phone before she made the additional allegations against defendant. Thus, the affidavit cannot be deemed noncumulative evidence of where A.P.H. obtained her sexual knowledge. We also disagree with defendant that Hosanna's affidavit impeaches Ryan's testimony concerning how she reacted when she learned that A.P.H. had visited pornographic websites. Ryan testified that she addressed the situation with A.P.H., which resolved it "[f]or the most part." She never testified that she addressed the situation "calmly" or denied that A.P.H. was somehow punished. Also, contrary to defendant's assertion, Hosanna never stated in the affidavit that Ryan became "enraged"; he stated only that there was "a lot of yelling." Again, Ryan did not testify otherwise.

¶ 91    In any event, even if the evidence presented in the affidavit were noncumulative—in that it established additional facts concerning the nature of Ryan's response to the discovery of pornography on A.P.H's cell phone—it is not arguable that the new evidence was "material" or "of such conclusive character that it would probably change the result on retrial." *Id.* ¶ 47. Defendant's claim that the affidavit established a motive for A.P.H. to fabricate the additional

charges is nothing more than speculation. In finding defendant guilty, the trial court specifically noted that its duty was to weigh the credibility of A.P.H. and defendant. The court stated:

"And it is the demeanor. It is [the] manner while testifying. It is looking at the specifics of what was said, and some of the additional information that was provided by [A.P.H.] when she was at the [VSI], and some of the details, and some of the statements that she made, and the manner in which she testified here that is significant to me."

The court expressly considered "the fact that there was no mention of [the new] allegations *** until July of 2017, five years after the initial allegations were made, and three years after the first trial in this matter." The court stated: "So having considered all of this evidence which was presented, and having heard and considered the arguments of counsel, I find that [A.P.H.] is credible in her claims."

¶ 92    Given that the trial court was aware that pornography was found on A.P.H.'s cell phone before she made the new allegations, it is not arguable that if the court heard additional evidence that, when Ryan found the pornography, "[t]here was a lot of yelling" and "Ryan told [A.P.H.] she was in big trouble," the court's credibility determinations would have been affected such that it would have reached a different result.

¶ 93                    2. Evidence on A.P.H.'s Cell Phone

¶ 94    Defendant contends that his petition presents "new evidence" consisting of "written documentation" "obtained after an analysis of APH's cell phone." According to defendant, this evidence establishes that (a) Ryan lied about the status of her marriage to defendant and (b) A.P.H. was not uncomfortable using sexual language. According to the petition, the State conducted a forensic analysis on A.P.H.'s phone in July 2017, before the second trial, and a disk containing the results of that analysis was in trial counsel's file.

¶ 95    First, defendant points to the following text messages obtained from A.P.H.'s cell phone, which she sent to a friend on July 3, 2017:

"When my mom and my real dad were together, they fought everyday [*sic*], until they ended up sleeping in seprat [*sic*] rooms[.] *** I would spend hours outside by myself, so I would have [*sic*] to listen to them yelling[.] *** And my dad was out of the house at work all day, and when he came home, we would just play video games[.]"

According to defendant, this evidence shows that Ryan's testimony that she and defendant "had little fights here and there, but in general, [got along] pretty well," was not true. He argues that the evidence also establishes a motive for Ryan to fabricate the allegations against defendant.

¶ 96    Second, defendant points to other information obtained from A.P.H.'s cell phone, namely that one of A.P.H.'s contacts was labeled "Penis" and that she had done a "Google" search for "penis meme," resulting in several images that included the word "penis." According to defendant, this evidence establishes that A.P.H. was comfortable using sexual language and that, thus, the use of word cards was not necessary.

¶ 97    Defendant cannot state an arguable actual innocence claim based on the information obtained from A.P.H.'s cell phone. In his brief, defendant claims that the evidence was "unknown to the trial court." That may be. However, for a claim of actual innocence, a defendant must present evidence that is both "newly discovered" *and* that defendant "could not have discovered earlier through the exercise of due diligence." *Id.* Here, the information on A.P.H.'s phone was discoverable through the exercise of due diligence before defendant's second trial.

¶ 98    In any event, even if the evidence on A.P.H.'s cell phone could be considered "newly discovered" and established that Ryan had minimized the degree of marital discord, it is not arguable that this evidence was "material" and "of such conclusive character that it would probably

change the result on retrial." *Id.* According to defendant, the evidence "shows Ryan's motive to fabricate the allegations." However, A.P.H.'s statements to Hawley during the VSI interview clearly rebut any theory that Ryan assisted in fabricating the allegations. A.P.H. told the interviewer that she regretted telling Ryan about the game she played with defendant. When the interviewer asked why, A.P.H. stated: "Because none of this would have ever happened. It could keep the same." When the interviewer asked, "what would be the same," A.P.H. stated, "It would be the same. Nothing would have happened. My dad wouldn't leave and my mom wouldn't call the cops." Later in the interview, she reiterated that she regretted telling Ryan. She stated: "[Defendant] would still be here. No one would be mad. I wouldn't have to go here or anything." It is not arguable that, had trial counsel presented the evidence on A.P.H.'s phone indicating that Ryan and defendant "fought everyday [*sic*]," it "would probably lead to a different result." *Id.* Indeed, in *Hemphill II*, defendant asserted an ineffectiveness claim based in part on counsel's failure to use portions of the January 5, 2012, recording to rebut the State's assertion that Ryan's and defendant's marriage was harmonious. *Hemphill*, 2021 IL App (2d) 190473-U ¶ 130. In rejecting that claim, we specifically noted that "whether Ryan and defendant were satisfied with their marriage [was] [a] minor or tangential issue[ ] that would not have affected the trial's outcome." *Id.* ¶ 136.

¶ 99    It is also not arguable that admission of the evidence on the cell phone, which defendant claims showed that A.P.H. was not uncomfortable using sexual terms, would "probably change the result on retrial." *Robinson*, 2020 IL 123849, ¶ 47. First, we disagree with defendant's claim that the evidence would have precluded using word cards. In *Hemphill II*, defendant argued that the trial court abused its discretion in allowing the use of word cards. In rejecting that argument, we noted: "The assistant state's attorney stated that during A.P.H.'s 2017 CAC interview and

during interviews with the prosecutor, A.P.H. would not speak the words because she associated them with terrible things and would instead use hand signals." *Hemphill*, 2021 IL App (2d) 190473-U, ¶ 122. Given the State's reasoning for the necessity of using word cards, any evidence that A.P.H. had used the words *in writing* to a friend on her phone, or had sexual memes on her phone, would not change the fact that A.P.H. did not want to speak the words. Moreover, in denying defendant's posttrial motion—where he argued it was error to allow using word cards— the trial court specifically found that using word cards did not prejudice defendant. The court stated: "It [the use of the word cards] didn't have an effect on [the court] as a trier of fact in terms of any unfair prejudice to the defendant. That was just her manner in which she expressed those terms. I didn't find it a major factor in my rulings."

¶ 100                    3. Ryan's Additional Recordings

¶ 101    Before turning to the next postconviction claim, we note that, within his actual innocence argument, defendant also claims: "Additionally, the evidence of [defendant's] denials on the overhears conducted in January and February 2017 [*sic*] helped establish his innocence."

¶ 102    In his petition, defendant stated that, on January 13, 2012, a court order was entered authorizing the use of an eavesdropping device between January 13, 2012, and February 12, 2012. In support, he did not attach a copy of the court order; instead, he attached a copy of his February 24, 2017, motion, which sought to suppress the January 5, 2012, recording secretly made by Ryan. In the motion to suppress, defendant referred to the court's order authorizing the overhears and stated that "the State did not tender any discovery from any evidence elicited as it related to the eavesdropping device and overhear during the period of January 13, 2012[,] through February 12, 2012." Apparently, the matter was not addressed in the trial court. Defendant further asserted in his petition that "[postconviction] counsel obtained the recordings upon receipt of the trial

counsel's file." Defendant attached to his petition disks containing Ryan's recordings from January 18, 2012, and January 24, 2012.

¶ 103 On appeal, however, defendant claims only that this evidence "help[s] establish his innocence." He makes no argument that the evidence is "new" for purposes of his actual innocence claim. Indeed, he does not even specify or cite the portions of the recordings he relies on. Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) requires that the appellant include an "[a]rgument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." The failure to develop an argument, cite persuasive authority, or present a well-reasoned argument violates Rule 341(h)(7). *Velocity Investments, LLC v. Alston*, 397 Ill. App. 3d 296, 297 (2010). In such a case, we have the authority to hold that an argument has been forfeited. *Id.* Accordingly, defendant has forfeited any actual innocence claim based on these recordings. Even if we were to consider defendant's arguments, they are without merit because, the evidence that defendant denied the allegations is not of such a conclusive character that it would have probably changed the result on retrial.

¶ 104                    B. The State's Alleged Withholding of Evidence

¶ 105 We next consider defendant's contention that the trial court erred in summarily dismissing his postconviction petition, because he stated an arguable claim that the State improperly withheld evidence.

¶ 106 In his postconviction petition, defendant claimed that the State violated *Brady*, 373 U.S. 83 (1963), when it withheld the following evidence from defendant: (1) evidence of A.P.H.'s visits to Pornhub and (2) evidence of recordings made by Ryan on January 18, 2012, and January 24, 2012. He also claimed, with respect to the January 18, 2012, and January 24, 2012, recordings,

that the State violated the notice requirement of section 108A-8(a) of the Code (725 ILCS 5/108A-8(a) (West 2016)).

¶ 107   In *Brady*, the United States Supreme Court held that "the prosecution must disclose evidence that is favorable to the accused and 'material either to guilt or to punishment.' " *People v. Harris*, 206 Ill. 2d 293, 311 (2002) (quoting *Brady*, 373 U.S. at 87). To succeed on a *Brady* claim, a defendant must establish "(1) the undisclosed evidence is favorable to the accused because it is either exculpatory or impeaching; (2) the evidence was suppressed by the State either wilfully or inadvertently; and (3) the accused was prejudiced because the evidence is material to guilt or punishment." *People v. Beaman*, 229 Ill. 2d 56, 73-74 (2008). "Evidence is material if there is a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed." *Id.* at 74. To establish materiality, a defendant must show that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995).

¶ 108                     1. Evidence of A.P.H.'s Visits to Pornhub

¶ 109   Defendant contends that the State violated *Brady* by withholding evidence of A.P.H.'s visits to Pornhub. Defendant asserted in his petition that the State conducted a forensic analysis on A.P.H.'s cell phone in July 2017, before the second trial. A disk containing the results of that analysis was contained in trial counsel's file. After the second trial, postconviction counsel provided the disk to Brian Karel. According to Karel's affidavit attached to the petition, he was a "computer consultant with specialized knowledge related to computers and cell phones" and owned a business named "BrainSearch." Karel averred that he "access[ed] and review[ed] the data on the phone" and found "no evidence on this phone that the website 'Pornhub' was visited." Karel

concluded that "before the cell phone extraction was performed, all evidence of visits to Pornhub was deleted."

¶ 110    Defendant has not presented an arguable *Brady* claim. First, it is important to note that, in his opening brief, defendant asserts that Karel stated that "evidence of APH's visits to Pornhub *and all of the pornographic videos had been deleted*." (Emphasis added.) He asserts in his reply brief that Karel "concluded that a*ny and all visits related to the viewing of pornographic videos* were deleted prior to the State's analysis." (Emphasis added.) That is not what Karel stated or concluded. Karel stated only that he found "no evidence on this phone that the website 'Pornhub' was visited." This is significant because Ryan did not unequivocally testify that A.P.H. viewed the pornography on "Pornhub." She stated, "I *think* it was [Pornhub]." (Emphasis added.) In addition, although A.P.H. acknowledged that she viewed pornography on her cell phone, she did not name the website that she visited. Thus, she might not have been looking at Pornhub specifically. Moreover, even if there was conclusive evidence that A.P.H. viewed pornography on Pornhub specifically, it is nothing more than speculation to claim that the State (as opposed to A.P.H. or Ryan) deleted evidence of these visits before the phone was turned over for analysis. Thus, it is not arguable that the State either willfully or inadvertently suppressed evidence. (Curiously, in making his *Brady* argument on appeal, defendant does not expressly claim that the State suppressed the evidence; he states only that "evidence was deleted from the phone.").

¶ 111          2. Recordings Made by Ryan on January 18, 2012, and January 24, 2012

¶ 112    We next consider defendant's argument concerning evidence of recordings made by Ryan on January 18, 2012, and January 24, 2012. In his petition, defendant stated that "it is unknown *if* or when the January 2012 recordings wherein Ryan sought admissions from [defendant] were provided to the defense." (Emphasis added.) However, he also stated that "[postconviction]

counsel obtained the recordings upon receipt of the trial counsel's file," which indicates that the recordings *were* received by trial counsel. He then claimed that "[i]f the overhears were not turned over until after trial or at a time defense counsel could make use of them, another *Brady* violation occurred."

¶ 113 On appeal, defendant has abandoned any *Brady* claim with respect to these recordings. Instead, he focuses on his claim that the State violated section 108A-8 of the Code (725 ILCS 5/108A-8 (West 2016)) by failing to comply with its notice requirements. Section 108A-8 provides:

"Notice to Parties Overheard.

(a) Within a reasonable time, but not later than 90 days after either the filing of an application for an order of authorization or approval which is denied or not later than 90 days after the termination of the period of an order or extension thereof, the issuing or denying judge shall cause to be served on the persons named in the order or application and such other persons in the recorded conversation as the judge may determine that justice requires be notified, a notice of the transaction involving any requested or completed use of an eavesdropping device which shall include:

(1) notice of the entry of an order, of subsequent approval in an emergency situation, or the denial of an application;

(2) the date of the entry, approval, or denial;

(3) the period of the authorized use of any eavesdropping device; and

(4) notice of whether during the period of eavesdropping devices were or were not used to overhear and record various conversations and whether or not such conversations are recorded.

On an *ex parte* showing of good cause, the notice required by this subsection may be postponed.

(b) Upon the filing of a motion, the judge may in his discretion make available to such person or his attorney for inspection such portions of the recorded conversations or the applications and orders as the judge determines it would be in the interest of justice to make available.

(c) The contents of any recorded conversation or evidence derived therefrom shall not be received in evidence or otherwise disclosed in any trial, hearing, or other judicial or administrative proceeding unless each party not less than 10 days before such a proceeding has been furnished with a copy of the court order and accompanying application under which the recording was authorized or approved and has had an opportunity to examine the portion of the tapes to be introduced or relied upon. Such 10 day period may be waived by the judge if he finds that it was not possible to furnish the party with such information within the stated period and that the party will not be materially prejudiced by the delay in receiving such information." *Id.* § 108A-8.

According to defendant, "[a]t best, the State gave notice sometime after February 24, 2017. That was the date of the pleading wherein the defense complained that it had not received any discovery of the overhear."

¶ 114   Any argument based on the State's failure to provide proper notice under this section is forfeited because it could have been raised in defendant's direct appeal. See *Munz*, 2021 IL App (2d) 180873, ¶ 29 (arguments based on the record and not raised on direct appeal are forfeited). The record contains the February 24, 2017, motions in which defendant asserted that, on January 13, 2012, the trial court entered an order authorizing overhears between January 13, 2012, and

February 12, 2012. According to defendant, the record contains no evidence that defendant received the requisite notice related to this order. Defendant could have made the same claim on direct appeal. See *id.* He makes no argument that the issue could not have been raised in his direct appeal or that appellate counsel was ineffective for failing to raise the issue. See *id.*

¶ 115                    C. Ineffective-Assistance-of-Counsel Claims

¶ 116  Finally, we consider defendant's claim that his petition stated an arguable claim of "[i]neffective [a]ssistance of [c]ounsel for fail[ing] to present exonerating evidence." More specifically, defendant argues that counsel was ineffective for failing to present (1) the evidence on A.P.H.'s cell phone showing that (a) the marriage was "in turmoil" and (b) A.P.H. was not "sexually naïve" and (2) the evidence of defendant's denials on the January 18, 2012, and January 24, 2012, recordings.

¶ 117  To state a claim of ineffective assistance of counsel in first-stage postconviction proceedings, a defendant must show that it is arguable that (1) counsel's performance fell below an objective standard of reasonableness and (2) counsel's deficient performance prejudiced defendant. *Hodges*, 234 Ill. 2d at 17 (citing *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984)). More precisely, a defendant must show it is arguable that "counsel's performance was objectively unreasonable under prevailing professional norms and that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *People v. Cathey*, 2012 IL 111746, ¶ 23 (quoting *Strickland*, 466 U.S. at 694). A "reasonable probability" is "defined as a showing sufficient to undermine confidence in the outcome, rendering the result unreliable or fundamentally unfair." *People v. Patterson*, 2014 IL 115102, ¶ 81 (citing *People v. Evans*, 209 Ill. 2d 194, 220 (2004)). When "it is possible to resolve an ineffective-assistance claim on the basis that the defendant suffered no prejudice as a result of

counsel's allegedly defective performance, the claim may be decided against the defendant without consideration of whether counsel's performance was actually deficient." *People v. Coleman*, 168 Ill. 2d 509, 528 (1995).

¶ 118                    1. Failure to Present Evidence on A.P.H.'s Cell Phone

¶ 119   We first consider defendant's claim that trial counsel was ineffective for failing to present the evidence on A.P.H.'s cell phone showing that the marriage was "in turmoil." According to defendant, his "theory of defense was that Ryan assisted in fabricating the evidence because the marriage was in turmoil." He argues that, because Ryan testified that the marriage was "fine," this evidence would show that "Ryan lied about [a] key fact." According to defendant, the evidence would support his claim that Ryan assisted in fabricating evidence against defendant.

¶ 120   This claim fails for lack of arguable prejudice. As already discussed in the context of defendant's actual innocence claim (*supra* ¶ 98), even if the cell phone evidence established that Ryan had minimized the degree to which the parties argued, A.P.H.'s statements during the VSI interview clearly rebut any theory that Ryan played a role in fabricating the allegations. In his reply brief, defendant additionally argues that the evidence would establish a motive for A.P.H. to fabricate. However, we fail to see how a child would be motivated to fabricate such claims against a parent if they believed the home life was already in turmoil. A.P.H.'s statements to the interviewer made clear that she regretted telling Ryan what had happened and that she did not want defendant to leave. Again, as we noted in *Hemphill II*, "whether Ryan and defendant were satisfied with their marriage [was] [a] minor or tangential issue[ ] that would not have affected the trial's outcome." *Hemphill*, 2021 IL App (2d) 190473-U, ¶ 136. Accordingly, it is not arguable that, had trial counsel presented the evidence on A.P.H.'s phone regarding the state of defendant's and

Ryan's marriage, there is a reasonable probability that the result of the trial would have been different.

¶ 121   We next consider defendant's claim that counsel was ineffective in failing to present the evidence on A.P.H.'s cell phone showing that A.P.H. was not "sexually naïve." Defendant argues that, had counsel presented this evidence, it would have precluded the State from using word cards, which—according to defendant—gave the State "an overwhelming advantage."

¶ 122   This claim, too, fails for lack of arguable prejudice. As already discussed in the context of defendant's actual innocence claim (*supra* ¶ 99), given the State's reasoning for why the word cards were necessary, any evidence that A.P.H. had used the words in writing to a friend on her cell phone, or had sexual memes on her phone, would not change the fact that A.P.H. did not want to speak the words. Thus, it is not arguable that, had the evidence been presented, the State would have been precluded from using word cards. Moreover, it is not arguable that defendant was prejudiced by APH's use of word cards, given the trial court's express statement to the contrary when denying defendant's posttrial motion.

¶ 123              2. Failure to Present Evidence of Ryan's January 18, 2012,

and January 24, 2012, Recordings

¶ 124   Finally, we consider defendant's argument that trial counsel was ineffective in failing to present evidence showing that defendant denied accusations in "the early 2012 overhears." To support this claim below, defendant attached to his petition Ryan's recordings from January 18, 2012, and January 24, 2012. According to defendant, the State was allowed to present evidence (from the January 5, 2012, recording) that suggested that defendant did not deny Ryan's accusations. He argues, without citing any specific portion of the January 18 and January 24 recordings, that he "was entitled to present, and the court was entitled to hear, that just days later,

Ryan continued her attempts to obtain a confession and failed." He further argues, again without citing any specific portion of the recordings, that "the recordings demonstrate Ryan's bias and motive to convict [defendant]."

¶ 125   First, it is not arguable that counsel was objectively unreasonable in failing to seek admission of the recordings to rebut the State's claim that defendant failed to deny the accusations. First, defendant admitted at trial that he did not deny the allegations when Ryan first confronted him. He explained: "I was terrified that the allegations would be believed, and then I'd end up dead or killed in prison or whatever. I mean, I was terrified." He expressly denied any sexual contact with A.P.H.

¶ 126   Given defendant's testimony, any denials on January 18, 2012, and January 24, 2012, would be inadmissible as prior consistent statements. Prior consistent statements are inadmissible on direct examination, because they unfairly bolster a witness's credibility. *People v. Terry*, 312 Ill. App. 3d 984, 995 (2000). However, a prior consistent statement is admissible to rebut the inference that the witness was motivated to testify falsely, so long as the motive did not exist at the time of the prior consistent statement. *People v. Lambert*, 288 Ill. App. 3d 450, 453 (1997). Here the State did not accuse defendant of a recent fabrication, further, the motive to testify falsely would have existed when defendant made the subsequent denial. Defendant cites no authority to establish that the evidence is otherwise admissible. Thus, it is not arguable that counsel was objectively unreasonable in failing to seek admission of the evidence.

¶ 127   As for defendant's claim that counsel was objectively unreasonable in failing to seek admission of the recordings to show Ryan's motive to falsely accuse defendant, it is not arguable that his failure to do so resulted in prejudice. As already noted (*supra* ¶ 98), A.P.H.'s comments to Hawley make clear that Ryan played no role in the accusations.

¶ 128                                    III. CONCLUSION

¶ 129   For the reasons stated, we affirm the judgment of the circuit court of Kendall County.

¶ 130   Affirmed.